**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: ABILIFY (ARIPIPRAZOLE) PRODUCTS LIABILITY LITIGATION<br><br>This document relates to all cases. | Case No. 3:16-md-2734<br><br><br>Chief Judge M. Casey Rodgers<br>Magistrate Judge Gary Jones |

**DEFENDANTS' JOINT BRIEF REGARDING
<u>CURRENT STATUS OF LITIGATION</u>**

Pursuant to this Court's October 19, 2016 Order Establishing Interim Procedures, ECF No. 8, defendants Bristol-Myers Squibb Company ("BMS"), Otsuka America Pharmaceutical, Inc. ("OAPI"), and Otsuka Pharmaceuticals Co. Ltd ("OPC"), submit this joint brief.  The brief (i) provides a factual background on Abilify®, the conditions it treats, and its label; (ii) describes the plaintiffs' theory of the case and challenges plaintiffs will confront based on science and law; and (iii) provides the current procedural status of the Abilify gambling behavior litigation both in federal and state court.

**I.    FACTUAL BACKGROUND**

    **A.    Abilify and the Diseases It Treats**

Abilify (generic name aripiprazole) belongs to a class of drugs known as "atypical" or "second-generation" antipsychotics.  The FDA first approved Abilify for sale in November 2002 for the treatment of schizophrenia.  Over the next

several years, FDA approved Abilify for the treatment of bipolar disorder, pediatric bipolar, pediatric schizophrenia, irritability associated with autistic disorder in certain pediatric patients, and as adjunctive therapy for major depressive disorder. In the 14 years since it first received FDA approval, an estimated 24 million patients have used Abilify to help manage some of the most challenging mental health conditions that exist.

Abilify is not a "lifestyle drug." The psychiatric conditions it treats are severe and often life-threatening. Schizophrenia affects the way people think, feel, and act. Patients suffering from the disease may hear voices or see things that are not there. They may lose touch with reality and are often not capable of completing ordinary daily tasks. Likewise, bipolar disorder causes dramatic shifts in mood and energy levels. Patients alternate between feeling abnormally energetic and depressed. In the manic phase, they may feel euphoric, agitated, or jumpy. They may have grandiose or racing thoughts. In the depressive phase, they may feel hopeless and even suicidal. Patients may engage in risky behaviors, creating risks of harm to themselves and others, in either phase.

Patients with major depressive disorder develop symptoms similar to those experienced by bipolar patients in a depressive phase. Patients with major depressive disorder lose interest or pleasure in daily activities for an extended

period of time.  They may experience significant weight change, change in sleep, change in psychomotor activity, or suicidality.

All of these conditions are severe and chronic.  None has a cure.  Patients suffering from these illnesses often must take medication continuously to be able to function in daily life.

### B.    Abilify's Side Effect Profile

Given the severity of these mental health conditions, the drugs used to treat them are potent and carry serious side effects.  Historically — from the 1960s until the 1990s — these conditions were treated with "first-generation" antipsychotics. These drugs, while effective, could cause severe involuntary tremors and body rigidity.  Given these complications, researchers searched for and eventually developed a new class of "second-generation" antipsychotics.

Second-generation antipsychotics revolutionized the treatment of patients with schizophrenia and bipolar disorder.  Patients generally tolerated these drugs better than first-generation antipsychotics, and they quickly became the first treatment option for many physicians.  These drugs include Risperdal (approved late 1993), Zyprexa (1996), Seroquel (1997), Geodon (2001), and ultimately Abilify (2002).  These second-generation antipsychotics, though safer than the first-generation, also have serious side effects.

For its part, the Abilify label since its inception has warned of a number of serious adverse events, including tardive dyskinesia, a syndrome of irreversible movements, and neuroleptic malignant syndrome, which is characterized by symptoms of high fever, sweating, unstable blood pressure and muscular rigidity that can lead to death.  The Abilify label also carries a "black box" warning — the most prominent warning in a label — about the risks of suicidal thoughts and behaviors with antidepressant drugs, and increased mortality in elderly patients with dementia-related psychosis.  The Abilify label describes all of these and many other possible side effects to give doctors the information they need to decide whether to prescribe Abilify to a particular patient.

This case concerns a potential risk of impulsive or compulsive behaviors, almost always compulsive gambling.  Since 2006, the Abilify label has cautioned doctors to observe patients for unusual changes in behavior (including impulsivity) when monitoring for suicidality:

> All patients being treated with antidepressants for any indication should be monitored appropriately and observed closely for . . . unusual changes in behavior; the following symptoms . . . impulsivity, hypomania and mania . . . have been reported in adult and pediatric patients being treated with antidepressants . . . ; familiar and caregivers of patients being treated with anti-depressants . . . should be alerted about the need to

> monitor patients for . . . unusual changes in behavior, and the other symptoms described above.[1]

As with any drug, as more patients have taken Abilify, more information about possible side effects has emerged.  Over time, a handful of published case reports described patients developing compulsive gambling while taking Abilify.  The first report of compulsive gambling was published in 2010, years after the FDA first approved Abilify.  Defendants added a description of these case reports to the Abilify labeling in Europe, Canada, and, more recently, the United States, consistent with each region's particular regulatory scheme.

As one can imagine, different countries impose different requirements for labeling.[2]  Europe and Canada are no different.  As to the United States, neither defendants nor the FDA believed a label change was necessary until recently, despite defendants informing the FDA of the foreign label changes as well as the adverse reports.

***Europe.***  In 2011, European regulators approached defendants about the first published case reports of pathological gambling in Abilify users.  Defendants investigated the issue and believed the data — consisting of limited case reports

---

[1]   Abilify Product Label, *available at* https://www.otsuka-us.com/media/static/Abilify-PI.pdf.

[2]   For this reason, courts in the United States have excluded decisions of foreign regulators concerning the prescription drug labels in foreign countries.  Defendants do not believe the foreign labels or decisions of foreign regulators are relevant or admissible here.

only — was at best inconclusive.  But they acceded to the regulators' request to add the following statement to the European label:  "Post-marketing reports of pathological gambling have been reported among patients prescribed ABILIFY, regardless of whether these patients had a prior history of gambling.  Patients with a prior history of pathological gambling may be at increased risk and should be monitored carefully."

*Canada.*  In November 2015, Canadian regulators required that the Canadian Abilify label include substantially the same warning:  "Post-marketing reports of pathological gambling have been reported in patients treated with ABILIFY.  In relation to pathological gambling, patients with a prior history of gambling disorder may be at increased risk and should be monitored carefully."

*United States.*  Over the years, defendants submitted extensive data to FDA to obtain its approval for new indications.  Defendants also timely notified the FDA about the foreign label changes regarding compulsive gambling, and updated the FDA about associated adverse events in regulatory submissions to the agency.  Despite having all this information, for more than a decade, FDA did not voice any concern or raise any question about a link between Abilify and pathological gambling or compulsive behaviors.

In November 2014, the Robins Kaplan firm (which represents the majority of plaintiffs in the Abilify compulsive gambling litigation) sent defendants names

of 132 individuals who claimed to have developed compulsive gambling from
Abilify, along with a form complaint.  Over the next year, the firm sent defendants
additional names.  As they are required to do, the defendants reported these
"complaints" to the FDA as adverse drug event reports, and these "complaints"
constitute the vast majority of adverse event reports of compulsive behaviors with
Abilify.

In January 2016, based largely on the dramatic increase in case reports of
gambling from these legal claims, defendants added the phrase "pathological
gambling" to the "post-marketing experience" section of the United States label.
In May 2016, the FDA issued a safety warning about "new impulse-control
problems" associated with Abilify.[3]  Following this advisory, in August 2016, the
warnings section of the Abilify label was updated to state:

> Post-marketing case reports suggest that patients can
> experience intense urges, particularly for gambling, and
> the inability to control these urges while taking
> aripiprazole.  Other compulsive urges, reported less
> frequently include:  sexual urges, shopping, eating or
> binge eating, and other impulsive or compulsive
> behaviors.  Because patients may not recognize these
> behaviors as abnormal, it is important for prescribers to
> ask patients or their caregivers specifically about the
> development of new or intense gambling urges,
> compulsive sexual urges, compulsive shopping, binge or

---

[3]    FDA, Drug Safety Communication:  FDA warns about new impulse-control
problems associated with mental health drug aripiprazole (Abilify, Abilify
Maintena, Aristada), *available at*
http://www.fda.gov/Drugs/DrugSafety/ucm498662.htm.

compulsive eating, or other urges while being treated
with aripiprazole.  It should be noted that impulse-control
symptoms can be associated with the underlying
disorder.  In some cases, although not all, urges were
reported to have stopped when the dose was reduced or
the medication was discontinued.  Compulsive behaviors
may result in harm to the patient and others if not
recognized. Consider dose reduction or stopping the
medication if a patient develops such urges.[4]

## C.  Abilify Litigation

Even though Abilify has been prescribed over 45 million times, the drug has

been the subject of only a handful of product liability cases (most of which were

dismissed on the pleadings).  The first Abilify compulsive gambling case was filed

in January 2016.  Now, there are 45 cases pending in this MDL, and 21 cases

consolidated in New Jersey State court.[5]  Although plaintiffs' counsel have

informed defendants that they will file more cases, it has not happened to date.

With less than 70 total cases on file, this litigation appears — at least at this point

— to be different in scope and kind than typical high-stakes pharmaceutical

product liability litigation with thousands of plaintiffs.[6]

---

[4]     Abilify Product Label, *available at* https://www.otsuka-
us.com/media/static/Abilify-PI.pdf.

[5]     There is also one *pro se* complaint pending in the Northern District of Illinois,
which defendants will seek to have transferred to this MDL.

[6]     For example, since the United States Judicial Panel on Multidistrict Litigation
("JPML") entered its October 3, 2016 Order establishing the MDL, only three
federal cases have been filed by counsel.  By contrast, within 30 days of multi-
district litigation centralization, 419 additional actions were filed in *In re Lipitor
(Atorvastatin Calcium) Marketing, Sales Practices and Prods. Liab. Litig.* (No. II),
MDL No. 2502, 997 F. Supp. 2d 1354 (J.P.M.L. Feb. 18, 2014), 92 additional

Footnote continued on next page

## III.   PLAINTIFFS' THEORY OF THE CASE AND THE CHALLENGES PLAINTIFFS FACE

### A.   Plaintiffs' Theory

Plaintiffs claim that defendants knew, or should have known, that Abilify causes and contributes to uncontrollable compulsive behaviors, and that defendants failed to adequately warn of those risks.  Plaintiffs base their complaints on three things:  (1) a handful of case reports in the medical literature and spontaneous adverse event reports, most of which originated from plaintiffs' counsel in these cases; (2) decisions of regulators in Europe and Canada to require gambling warnings on the Abilify label, as well as the FDA's safety announcement and the subsequent United States label change; and (3) an alleged "mechanism of action" positing that Abilify causes compulsive behaviors through its effect on dopamine receptors in the brain.

### B.   Challenges Based on Science

Defendants expect plaintiffs will face significant scientific hurdles in proving their theory.

*First,* pathological gambling is a rare and complex condition associated with a number of risk factors.  Studies show that people who suffer from mental illness

---

Footnote continued from previous page

actions were filed *In re: Yasmin and Yaz Mktg., Sales Practices and Prods. Liab. Litig.*, MDL No. 2100, 655 F. Supp. 2d 1343 (J.P.M.L. Oct. 1, 2009), and 106 additional actions were filed in *In re: Mirapex Prod. Liab. Litig.*, MDL No. 1836, 493 F. Supp. 2d 1376 (J.P.M.L. June 22, 2007).

— including the conditions for which Abilify is prescribed — are 10 to 20 times more likely to engage in pathological gambling than the general population.[7] According to one study, between 7% and 12% of people with schizophrenia, bipolar disorder or major depressive disorder will gamble pathologically.[8]  As the Abilify label states:  "impulse-control symptoms can be associated with the underlying disorder."  Plaintiffs in these cases therefore were already at a heightened risk of compulsive gambling given their underlying mental health conditions.

Studies also show that between 8.5% and 10.3% of patients with substance use disorder — such as alcohol addiction or other drug dependency — engage in pathological gambling.[9]

The plaintiffs' underlying conditions or the presence of these risks factors may demonstrate why some or all of them engaged in compulsive gambling.

**Second,** there are no epidemiological studies finding a statistically significant association between Abilify and any compulsive behavior.  Plaintiffs are left to rely on spontaneous adverse event reports by Abilify users — most of

---

[7]    *See* Quilty et al., *The Prevalence and Course of Pathological Gambling in the Mood Disorders*, J. Gambl. Stud. 27:191-201 (2011).

[8]    *See id.*

[9]    *See* Rennert et al., *DSM-5 Gambling Disorder: Prevalence and Characteristics in a Substance Use Disorder Sample* (2014).

whom are claimants in this litigation — and a handful of anecdotal case reports in the medical literature.  These case reports lack controls and are unreliable evidence of causation.[10]  And the scientific literature reporting on compulsive gambling with use of Abilify notes that these case reports have limitations and should be considered with caution.[11]

The descriptions of the case reports in the Abilify label recently approved by the FDA, as well as the earlier labels in Europe and Canada, recognize these limitations.  The labels convey that post-marketing case reports *suggest* a potential link.  Nothing in these labels says that a causal link has been established.  Nor would the scientific evidence support such a "causation" statement.

---

[10]   *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1197 (11th Cir. 2010) ("Case studies and clinical experience, used alone and not merely to bolster other evidence, are . . . insufficient to show general causation."); *see also Wells v. Smithkline Beecham Corp.*, 601 F.3d 375, 381 (5th Cir. 2010) (affirming summary judgment for prescription drug manufacturer where plaintiff had no scientifically reliable expert evidence linking the drug to pathological gambling).

[11]   *See, e.g.*, Gaboriau, et al., *Aripiprazole: A new risk factor for pathological gambling? A report of 8 case reports,* Addictive Behaviors 39:562-565 (2014) ("[I]t is possible that other factors may have been involved, such as regular gambling, history of mood, psychotic or substance use disorder."); Neil Smith, et al., *Pathological Gambling and the Treatment of Psychosis with Aripiprazole: Case Reports*, 1999 British J. of Psychiatry 158 (2011) ("It should be noted that in the three cases reported, prescription of aripiprazole is not immediately followed by the onset of pathological gambling.  In two cases there was also evidence of problem gambling behaviour prior to the medication being started.") (emphasis added); Milton G. Roxanas, *Pathological Gambling and Compulsive Eating Associated with Aripiprazole*, 44 Australian & New Zealand J. of Psychiatry 291 (2010) ("A literature search using PubMed, PsychInfo and Embase and the manufacturer's data base did not find a previously reported case of compulsive behavior associated with aripiprazole[.]").

**Third,** we expect plaintiffs will rely on medical literature, regulatory actions, and, possibly, litigation findings related to a different class of drugs used to treat Parkinson's disease and that have been associated with compulsive behaviors. Plaintiffs will point to these drugs as analogous to Abilify and argue that Abilify has a similar mechanism of action that supposedly causes compulsive gambling. One of these drugs — Mirapex® — became embroiled in litigation and an MDL in Minnesota over a decade ago. In the view of defendants' experts, this theory does not hold up scientifically.

Mirapex and other Parkinson's drugs are "full" dopamine agonists: they activate dopamine receptors in the brain and boost dopamine activity.[12] They treat conditions like Parkinson's disease that are associated with **low** dopamine activity in areas of the brain that control motor function.

Abilify, by contrast, is considered a "partial" dopamine agonist: it functions either as a dopamine agonist (which activates dopamine receptors) or as a dopamine antagonist (which blocks dopamine receptors), depending on the dopamine activity in the brain at any given time. In patients suffering from conditions that are associated with **high** dopamine-related activity — like schizophrenia — Abilify is believed to reduce that activity.

---

[12]   *See* Joseph Friedman, *Atypical Antipsychotic Drugs in the Treatment of Parkinson's Disease*, J. of Pharmacy Practice 24(6):534-540 (2011).

In short, the "full" dopamine agonists (like Mirapex) and "partial" dopamine agonists (like Abilify) are different drugs that treat different conditions.  It is no surprise the drugs also have different side effect profiles.  With respect to compulsive behaviors in particular, significantly more reported events have been seen with a "full" antagonist like Mirapex than with Abilify.

## C.    Additional Challenges

In addition to the hurdles in establishing liability and causation described above, defendants expect plaintiffs will confront significant legal obstacles.

Plaintiffs assert counts for strict liability and negligence based on theories of failure to warn, manufacturing defect, and design defect.  Plaintiffs also assert claims for breach of express and implied warranties, negligence per se, negligent misrepresentation, violation of the state unfair trade practices laws, fraudulent concealment, and punitive damages.  The legal issues that plaintiffs will face include the following:

**1.    Plaintiffs may not be able to establish that warnings would have altered their doctors' prescription decisions.**  In a pharmaceutical product liability case, a plaintiff must prove that the prescribing physician not to have prescribed the medication if provided a different warning.  Plaintiffs may face difficulty showing this, given (a) the well-understood benefits and safety profile of Abilify in clinical practice, (b) the long-standing language of the Abilify label

mentioning the importance of monitoring for impulse control, (c) the known association between compulsive behaviors and the underlying mental health conditions Abilify treats, and (d) the other therapeutic options available to treat those conditions (which all have their own serious safety risks).

2.     **Many plaintiffs will face statute of limitations problems.**  Many plaintiffs' claims appear to be stale and barred under the applicable limitations period of their home states.  Plaintiffs' counsel already agreed to voluntarily dismiss one plaintiff's claims with prejudice after defendants raised a statute-of-limitations defense.  Other cases likely will face a similar fate.  Indeed, many of the plaintiffs claim to have been prescribed Abilify before 2012 and began gambling pathologically shortly thereafter.  Under many states' accrual rules, once these alleged injuries occurred, plaintiffs were required to investigate their cause. These claims may well have been barred years ago.

3.     **Even if plaintiffs could prove liability and causation, their claimed damages may be overstated or not recoverable.**  Defendants expect that plaintiffs may have difficulty providing reliable evidence of their alleged gambling losses.  Sporadic casino statements and bank withdrawals may not be enough. Claimed losses that exceed income, assets, or other funds available to gamble would also raise questions.  Defendants also expect that plaintiffs will face difficulty linking non-gambling economic losses (such as lost future wages or lost

retirement savings, homes or businesses) to Abilify and not to other factors. Claims that Abilify caused non-economic losses (such as the dissolution of marriage or suicide attempts) will also be difficult to tie to Abilify. It is also questionable whether plaintiffs will be able to establish any physical injury, which may be a threshold requirement for plaintiffs' claims.

**4. Plaintiffs may not have a claim for punitive damages.** Plaintiffs in product liability cases typically seek leverage against defendants based on the threat of punitive damages. Although defendants' fact investigation is continuing, we see no credible argument that defendants acted with the requisite intent to give rise to punitive damages. The governing law may not allow punitive damages in any event.

**5. Plaintiffs assert legally non-cognizable claims.** Given the nature of plaintiffs' boilerplate complaints, many of their claims are not cognizable under the governing substantive state law.

**6. OPC should be dismissed for lack of personal jurisdiction.** OPC is a Japanese corporation that was formed and is headquartered in Japan. It is not incorporated, nor does it have offices, in any U.S. state, thus precluding a U.S. state court's exercise of general personal jurisdiction. Nor is OPC subject to specific personal jurisdiction in this or any of the transferor forum states: OPC does not market or sell Abilify in the United States — OPC manufactures the

active pharmaceutical ingredient aripiprazole, in Japan.  OPC's involvement in the alleged suit-related conduct neither occurred in, nor was purposefully directed toward, any U.S. state.  Contacts with the United States as a whole, by contrast, are insufficient to support specific personal jurisdiction by any individual state.

Personal jurisdiction over OPC also may not be based on OAPI's alleged contacts because there is no basis for piercing the corporate veil between grandparent OPC and grandchild OAPI.  Indeed, by setting up a U.S. subsidiary, which employs U.S. workers, to handle Abilify activities in the United States, OPC acted as a foreign corporation should.  There is no question OAPI can satisfy any judgment in this case.  OPC is not a necessary party.

## IV.    CURRENT STATUS OF LITIGATION

### A.    Federal Court Litigation

With the exception of a *pro se* case recently filed in the Northern District of Illinois, all of the cases filed in federal court have been transferred to this Court. Attached hereto as Exhibit A is a chart showing the procedural status of all federal cases identified in Attachment A to the Interim Procedures Order and the second Conditional Transfer Order, ECF No. 5.

With few exceptions, little substantive activity occurred in the federal cases prior to transfer to this Court.  On April 26, 2016, Judge Naomi Reice Buchwald of the Southern District of New York granted defendants' request to file a motion to

dismiss based on statute of limitations.  Plaintiffs voluntarily dismissed that case with prejudice before defendants filed their motion.  In July 2016, plaintiffs voluntarily dismissed, with a right to refile, two cases pending in the Central District of California.  On August 16, 2016, Judge Michael Shipp of the District of New Jersey granted plaintiffs' motions to remand two cases to state court which defendant BMS removed under 28 U.S.C. § 1441(b).

OPC filed motions to dismiss for lack of personal jurisdiction in 20 of the currently active (i.e., not voluntarily dismissed) cases.  On June 14, 2016, Magistrate Judge Mark J. Dinsmore of the Southern District of Indiana issued a Report and Recommendation in the *Meyer* case ("R&R"), without entertaining jurisdictional discovery, recommending that OPC's motion be denied.  OPC objected to the R&R, but the case was transferred to this Court before the District Court Judge could rule on OPC's objections.  Jurisdictional discovery, and supplemental briefing based on that discovery, was in various stages of completion in 15 other cases before activity was stayed or otherwise ceased pending creation of this MDL.

### B.    State Court Litigation

Attached hereto as Exhibit B is a chart showing the procedural status of all cases in the related state-court litigation in New Jersey.  Abilify compulsive gambling cases have not been filed in other state courts.

17

In the New Jersey litigation, the parties have appeared before Judge Martinotti twice and Judge DeLuca twice, resulting in four Case Management Orders ("CMOs").[13]  According to the first CMO entered on April 26, 2016, "[t]he Court will use its best efforts to coordinate with all pending federal matters." CMO No. 1, ¶ IV.2.  The second, third, and fourth CMOs, entered on June 20, August 23, and October 21, 2016, respectively, require the parties to "utilize their best efforts to coordinate all proceedings/discovery with other jurisdictions and federal courts in order to avoid unnecessary conflicting obligations and duplicative productions."  CMO No. 2, ¶ I.C.4; CMO No. 3, ¶ I.C.2; CMO No. 4, ¶ I.C.4.

Limited discovery is underway in New Jersey.  Defendants have commenced production of certain "core discovery" documents, which the parties defined as key non-custodial documents that are both readily available from central sources and clearly relevant to issues of broad applicability.  OPC has produced and will continue to produce documents relevant to its motion to dismiss for lack of personal jurisdiction, and OPC has agreed to produce a corporate representative witness for a Rule 30(b)(6) deposition on that issue.  This discovery follows the New Jersey court's decision to deny OPC's motion to dismiss for lack of

---

[13]   The most recent Case Management Conference occurred before Judge DeLuca on October 21, 2016.

jurisdiction without prejudice to reassert the motion following discovery on personal jurisdiction.

The parties in New Jersey also have agreed to a Protective Order, a protocol for discovery of Electronically Stored Information, and the form of Plaintiff and Defendant Fact Sheets. The parties agreed to coordinate the exchange of those Fact Sheets and other discovery on a schedule consistent with the one the Court will establish in this MDL.

## C.    Additional Cases

Defendants cannot predict the number of cases that may become a part of this MDL or that will be filed in state court in the future.

*      *      *

Defendants look forward to the upcoming status conference scheduled for November 7, 2016.  Defendants will be prepared to discuss how the foregoing issues relate to the items listed in the parties' agenda letter and to the overall management of this litigation.  For example, defendants believe that it would be productive to consider ways to phase discovery so that defendants can receive information from plaintiffs and their prescribing doctors at an early stage, in a manner that is coordinated across the federal and state litigation.

Dated October 31, 2016.          Respectfully submitted,

*/s/  Larry Hill*
**MOORE, HILL & WESTMORELAND, P.A.**
Larry Hill (Florida Bar No. 173908)
Charles F. Beall, Jr. (Florida Bar No. 66494)
Kimberly S. Sullivan (Florida Bar No. 101408)
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
850-434-3541
lhill@mhw-law.com
cbeall@mhw-law.com
ksullivan@mhw-law.com

**ARNOLD & PORTER LLP**
Anand Agneshwar (*pro hac vice*)
399 Park Avenue
New York, NY 10022
212-715-1000
anand.agneshwar@aporter.com

Matthew A. Eisenstein (*pro hac vice*)
601 Massachusetts Avenue NW
Washington, DC 20001
202-942-5000
matthew.eisenstein@aporter.com

**HOGAN LOVELLS US LLP**
Lauren S. Colton (*pro hac vice*)
100 International Drive, Suite 2000
Baltimore, MD 21202
410-659-2700
lauren.colton@hoganlovells.com

Barry J. Thompson (*pro hac vice*)
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
310-785-4600
barry.thompson@hoganlovells.com

**CARLTON FIELDS JORDEN PA**
Edward W. Gerecke
David Joseph Walz
4221 W Boy Scout Blvd, Suite 1000
Tampa, FL 33607
813-223-7000
dwalz@carltonfields.com
egerecke@carltonfields.com

*Attorneys for Defendant Bristol-Myers Squibb
Company*

/s/ Matthew A. Campbell
**WINSTON & STRAWN LLP**
Matthew A. Campbell (*pro hac vice*)
Eric M. Goldstein (*pro hac vice*)
Rand K. Brothers (*pro hac vice*)
1700 K Street NW
Washington, DC 20006
202-282-5000
macampbe@winston.com
egoldstein@winston.com
rbrothers@winston.com

Luke A. Connelly (*pro hac vice*)
200 Park Avenue
New York, NY 10166
212-294-6700
lconnell@winston.com

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**
Hal K. Litchford
Kelly Overstreet Johnson
Russell Bradbury Buchanan
Kyle A. Diamantas
101 N Monroe Street, Suite 925
Tallahassee, FL 32301
850-425-7500
hlitchford@bakerdonelson.com
kjohnson@bakerdonelson.com
rbuchanan@bakerdonelson.com
kdiamantas@bakerdonelson.com

*Attorneys for Defendants
Otsuka Pharmaceutical Co., Ltd. and
Otsuka America Pharmaceutical, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY this 31st day of October, 2016, a true and correct copy of the foregoing was electronically filed via the Court's CM/ECF system, which will automatically serve notice of this filing via e-mail notification to all registered counsel of record.

*/s/ Larry Hill*