# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: ABILIFY (ARIPIPRAZOLE) PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to All Cases | Case No. 3:16-md-2734<br><br><br>Chief Judge M. Casey Rodgers<br>Magistrate Judge Gary Jones |

## DEFENDANTS' MOTION TO EXCLUDE THE GENERAL CAUSATION <u>OPINION OF DAVID MADIGAN</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................2

ARGUMENT .........................................................................................3

    I.    DR. MADIGAN IS NOT QUALIFIED TO OPINE ON
         GENERAL CAUSATION AND HIS REPORT EXCEEDS THE
         SCOPE OF HIS ASSIGNMENT. .......................................................4

         A.    Madigan is not qualified to opine on general causation. ............4

         B.    Madigan's testimony goes far beyond the agreed-upon scope
               of his report. ................................................................................7

    II.    DR. MADIGAN'S CAUSATION OPINION IS PURE
         SPECULATION AND IS NOT BASED ON ANY RELIABLE
         SCIENTIFIC METHODOLOGY. .......................................................8

    III.    DR. MADIGAN'S OPINION THAT THE ETMINAN STUDY IS
         SCIENTIFICALLY AND METHODOLOGICALLY SOUND IS
         INVALID. .......................................................................................10

         A.    Dr. Madigan's defense of the Etminan study is untenable in
               light of his published research. ..................................................10

          B.    Madigan's analysis of the Etminan study is unreliable
                because it fails to properly address the study's substantial
               flaws. .........................................................................................15

    IV.    DR. MADIGAN'S DISPROPORTIONALITY ANALYSES ARE
         NOT PROOF OF CAUSATION. ......................................................19

    V.    DR. MADIGAN'S CURSORY TREATMENT OF CASE
         REPORTS DOES NOT PROVE CAUSATION ...............................21

    VI.    DR. MADIGAN'S OPINION THAT RANDOMIZED CLINICAL
         TRIAL DATA IS NOT EVIDENCE OF ABSENCE FAILS ...........22

CONCLUSION .....................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accutane Litig.*,
  2015 WL 753674 (N.J. Super. L. Div. Atl. Cty. Feb. 20, 2015) .........................3

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ........................................................23

*Avendt v. Covidien Inc.*,
  314 F.R.D. 547 (E.D. Mich. 2016) .....................................................6

*Chapman v. Procter & Gamble Distrib., LLC*,
  766 F.3d 1296 (11th Cir. 2014) ........................................1, 3, 9, 19, 21

*Haggerty v. Upjohn Co.*,
  950 F. Supp. 1160 (S.D. Fla. 1996), *aff'd*, 158 F.3d 588 (11th Cir.
  1998) ................................................................................20

*Hendrix v. Evenflo Co.*,
  255 F.R.D. 568 (N.D. Fla. 2009) .....................................................2, 8

*Hendrix v. Evenflo Co.*,
  609 F.3d 1183 (11th Cir. 2010) ........................................................3

*Hollander v. Sandoz Pharm. Corp.*,
  289 F.3d 1193 (10th Cir. 2002) ........................................................2

*Jones v. Novartis Pharm. Corp.*,
  2017 WL 372246 (N.D. Ala. Jan. 26, 2017) ............................................5

*Kilpatrick v. Breg, Inc.*,
  613 F.3d 1329 (11th Cir. 2010) .....................................................2, 10

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137, 119 S. Ct. 1167 (1999)................................................18

*Lebron v. Sec'y of Fla. Dep't of Children & Families*,
  772 F.3d 1352 (11th Cir. 2014) .......................................................5

*Magistrini v. One Hour Martinizing Dry Cleaning*,
  180 F. Supp. 2d 584 (D.N.J. 2002) ........................................................................9

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ....................................................................20–21

*Norris v. Baxter Healthcare Corp.*,
  397 F.3d 878 (10th Cir. 2005) ............................................................................15

*In re Rezulin*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................10

*Rider v. Sandoz Pharm. Corp.*,
  295 F.3d 1194 (11th Cir. 2002) ....................................................................19, 21

*Siharath v. Sandoz Pharm. Corp.*,
  131 F. Supp. 2d 1347 (N.D. Ga. 2001) ................................................................5

*Sutherland v. Matrixx Initiatives, Inc.*,
  2006 WL 6617000 (N.D. Ala. Nov. 7, 2006) .....................................................21

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ..............................................................3–4, 18

## Other Authorities

American Psychiatric Association, *Diagnostic and Statistical Manual
  of Mental Disorders* (5th ed. 2013) ....................................................................16

Chan et al., *Adverse drug reactions–examples of detection of rare
  events using databases*, British J. of Clin. Pharmacology 80(4),
  855-861 (2014).......................................................................................................12

Dal Pan et al., *Postmarketing Spontaneous Pharmacovigilance
  Reporting Systems*, Pharmacoepidemiology (5th ed. 2012) ..............................20

Etminan et al., *Risk of Gambling Disorder and Impulse Control
  Disorder with Aripiprazole, Pramipexole, and Ropinirole: A
  Pharmacoepidemiologic Study*, J. Clin. Psychopharmacology
  37(1), 1-3 (2017)......................................................................................................1

FDA Guidance for Industry: Good Pharmacovigilance Practices and
  Pharmacoepidemiologic Assessment (2005).........................................19, 20, 22

Gaboriau et al., *Aripriprazole: A New Risk Factor for Pathological Gambling? A Report of 8 Case Reports*, Addictive Behaviors 39, 562-565 (2014)..................................................................22

Kennedy et al., *Frequency and Correlates of Gambling Problems in Outpatients with Major Depressive and Bipolar Disorder*, Canadian J. of Psychiatry 55(9), 568-574 (2010)...............................................16

Madigan et al., *A Systematic Statistical Approach to Integrating Information from Observational Studies*, Ann. Rev. of Stat. and Its Application 1, 11-39 (2013)..........................................................11, 15

Madigan et al., *Evaluating the Impact of Database Heterogeneity on Observational Study Results*, Am. J. of Epidemiology 178(4), 645-651 (2013)..........................................................................11, 12

Madigan et al., *Empirical Performance of the Case-Control Method: Lessons for Developing a Risk Identification and Analysis System*, Drug Safety 36(1), 73-82 (2013)...............................................11–13

Moore et al., *Reports of Pathological Gambling, Hypersexuality, and Compulsive Shopping Associated with Dopamine Receptor Agonist Drugs*, 174 JAMA Int'l Med. 1930, E1-E4 (2014)...........................................20

Quilty et al., *The Prevalence and Course of Pathological Gambling in the Mood Disorders*, J. Gambl. Study 27, 191-201 (2010)...............................16

Schuemie et al., *Interpreting Observational Studies: Why Empirical Calibration is Needed to Correct p-Values*, Stat. in Med. 33(2), 209-218 (2014)........................................................................11, 13

Schuemie et al., *Robust Empirical Calibration of p-Values Using Observational Data: Comment on Limitations of 'Empirical Calibration of p-Values Using Observational Data'*, Stat. in Med., DOI: 10.1002/sim.6977 (2016)..............................................14

Trend, Merriam-Webster.com (2017) https://www.merriam-webster.com/dictionary/trend ...........................................24

Trifirò & Sultana, *The Role of Healthcare Databases in Pharmacovigilance of Psychotropic Drugs*, Pharmacovigilance in Psychiatry, 73-94 (2016)...............................................................12

iv

## INTRODUCTION

Plaintiffs' expert Dr. David Madigan claims that Abilify® causes pathological gambling based on four pieces of evidence:  (1) the Etminan study[1]; (2) his own disproportionality analysis of the FDA Adverse Event Reporting System ("FAERS"); (3) literature case reports; and (4) clinical trial data.

Dr. Madigan's testimony is inadmissible for five reasons.  *First*, Dr. Madigan is a biostatistician with no expertise in pathological gambling or impulse control disorders and is not qualified to opine on general causation—a topic well beyond the agreed-upon scope of his report.  *Second*, Dr. Madigan's testimony that the Etminan study is methodologically sound is belied by both his published criticism of such studies and his failure to address the study's significant flaws.  Indeed, Dr. Madigan's litigation-driven work in this case directly contradicts the findings and recommendations of his peer-reviewed scientific literature.  *Third*, Dr. Madigan's disproportionality analysis of spontaneous report data cannot establish causation, a point well-recognized by the Eleventh Circuit.  *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014).  *Fourth*, Dr. Madigan's cursory review of literature case reports does not establish causation—and in

---

[1] Ex. D, Etminan et al., *Risk of Gambling Disorder and Impulse Control Disorder with Aripiprazole, Pramipexole, and Ropinirole: A Pharmacoepidemiologic Study*, J. Clin. Psychopharmacology 37(1), 1-3 (2017).

fact—contradicts his analysis. *Fifth*, Dr. Madigan admits that not a single case of pathological gambling was located in the placebo-controlled clinical trials.

## BACKGROUND

Dr. Madigan is a Professor of Statistics at Columbia University. He is a bio-statistician with a Ph.D. in statistics. Ex. C, Madigan Dep. 18:17-19. Accordingly, he is offered here as a biostatistician, not an epidemiologist. *Id.* at 20:7-12. He does not hold a degree in public health or epidemiology. *Id* at 18:5-10. He is not a medical doctor, toxicologist, psychiatrist, or a psychologist. *Id.* at 16:24-17:9. He does not hold himself out as an expert in impulse control disorders or pathological gambling. *Id.* at 17:12-17.

Dr. Madigan asserts that by examining the "totality of the evidence," he can conclude that Abilify causes pathological gambling. But the sum of nothing remains nothing. It is not enough merely to "state[] potential associations and speculate[]" that a product causes harm. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1341 (11th Cir. 2010). An expert cannot combine "individual categories of evidence deemed unreliable … to form a reliable theory." *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1216 (10th Cir. 2002). Without explanation as to how he arrived at his conclusions, this Court cannot fulfill its duty to "undertake an independent analysis of each step in the logic leading to the expert's conclusions." *Hendrix v. Evenflo Co*., 255 F.R.D. 568, 578 (N.D. Fla. 2009) (Rodgers, J.).

2

Importantly, a New Jersey court recently excluded Dr. Madigan's opinions because he is "an expert on a mission." *In re Accutane Litig.*, 2015 WL 753674, at *19 (N.J. Super. L. Feb. 20, 2015). Over the last few years, he has made as much as "one-third of his income" doing plaintiff's work in at least nine pharmaceutical cases. Ex. F, *Glynn v. Merck* Testimony, at 980:14-19; *see* Ex. A, Madigan Rep. at App. 2. "[His] opinions aren't 'methodology based,' but rather conclusion-driven." *In re Accutane Litig.*, 2015 WL 753674, at *19. The same is true here.

## ARGUMENT

The Eleventh Circuit requires "an exacting analysis of the foundations of expert opinions." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). For proving general causation, three "methodologies" are "indispensable"—though not automatically sufficient—"dose-response, epidemiological evidence, and background risk." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1304 (11th Cir. 2014). All other "secondary methodologies" are always "insufficient proof of general causation." *Id.* As to an expert's qualifications, this Court must conduct a "rigorous" inquiry to assess whether the "expert is qualified to testify competently regarding the matters that he intends to address." *Hendrix v. Evenflo Co*., 609 F.3d 1183, 1194 (11th Cir. 2010) (emphasis added).

Dr. Madigan's opinions are conclusion-driven and not based on sound science. He is unqualified to opine on causation, and he offers no discernible methodology to support his conclusions. He relies solely on insufficient secondary methods to prove causation. Moreover, his sources and peer-reviewed academic writings contradict his litigation-drawn conclusions. His untested and unverifiable "weight of the evidence" reasoning must be rejected.

## I.   DR. MADIGAN IS NOT QUALIFIED TO OPINE ON GENERAL CAUSATION AND HIS REPORT EXCEEDS THE SCOPE OF HIS ASSIGNMENT.

Dr. Madigan has exceeded the scope of this Court's order, and he lacks the knowledge and expertise about medical causation to opine on whether Abilify causes pathological gambling and impulse control disorders. His opinions should be excluded.

### A.   Madigan is not qualified to opine on general causation.

Dr. Madigan is a man of statistics, not medicine. He is not qualified to offer an opinion on general causation because he does not have the requisite "knowledge, skill, experience, training, or education." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (explaining that "experience, standing alone, is [not] a sufficient foundation rendering reliable any conceivable opinion the expert may express"). In fact, it is not uncommon for a court to exclude a statistician's general causation opinion that a drug causes a particular adverse effect, even

when they have experience in drug safety matters. *See Jones v. Novartis Pharm. Corp.*, 2017 WL 372246, at \*29 (N.D. Ala. Jan. 26, 2017) (statistician not qualified to offer general causation opinion).

When it comes "to general causation, the relevant scientific field is epidemiology or toxicology." *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1363 (N.D. Ga. 2001). "Expertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Florida Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that an expert with "a background in clinical psychiatry and the treatment of drug abuse" was not qualified to testify "about the rates of drug use among [a particular] population").

Here, Dr. Madigan fails to meet these minimal requirements. Undoubtedly, he has research interests and experience using statistics to develop safety signals. Ex. A, Madigan Rep. 1-2. But that is not enough to offer a general causation opinion here. *Jones v. Novartis Pharm. Corp.*, 2017 WL 372246, at \*29 (N.D. Ala. Jan. 26, 2017). In *Jones*, the proffered expert had experience "in designing statistical method sections for clinical trials and in contributing statistical information on variables that could affect the outcome of a study to clinical trial design experts." *Id.* But he had never designed the protocol for a clinical trial, did not have a medical degree, and did not have medical expertise in the subject area. *Id.* The statistician's opinion was excluded. So, too here.

5

Although an "expert may be qualified by personal knowledge and experience, . . . such 'experience-based' testimony must be the product of 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Avendt v. Covidien Inc.*, 314 F.R.D. 547, 563 (E.D. Mich. 2016) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).  Dr. Madigan claims here that he "teach[es] statistics, and [] teach[es] epidemiology" at Columbia University and that is enough to be "an expert in epidemiology."  Ex. C, Madigan Dep. at 18:14-15, 18:23-24.  But Dr. Madigan does not have a degree in public health or epidemiology.  *Id*. at 17:24-18:04.  Nor he does he have an appointment in Columbia's department for epidemiology.  *Id*. at 18:05-18:10.  The mention of epidemiological concepts in courses taught for other departments does not render Dr. Madigan an expert on epidemiology.

Dr. Madigan concedes that he is not an expert in pathological gambling or impulse control disorders.  Ex. C, Madigan Dep. 17:12-17.  He has not "performed [his] own analysis about biological plausibility" and relies entirely on Plaintiffs' other experts.  *Id.* at 259:11-25.  And Plaintiffs only offer his opinion here, as a biostatistician.  *Id.* at 20:7-12.  Yet, he purports to know that Abilify's effect on neurochemistry causes conditions that he is not qualified to discuss.  Ex. B, Madigan Supp. Rep. at 2.

**B.     Madigan's testimony goes far beyond the agreed-upon scope of his report.**

Per the Court's general causation schedule, Plaintiffs' general causation expert reports were due on April 20, 2017.  Given the substantial time and effort needed to collect all available data relating to clinical trials conducted over two decades and in dozens of countries, Defendants agreed to a limited exception to this schedule:  Plaintiffs could serve a biostatistician expert report relying on that clinical data over one month later on May 31, 2017.  Pursuant to the parties' stipulation, the Court ordered that "Plaintiffs will serve the expert report of their biostatistician providing any opinions and/or analyses *that rely upon aripiprazole clinical trial data produced in this case*."  ECF No. 324 at 2 (emphasis added); ECF No. 364 (same limitations, but with a further adjusted date).  Dr. Madigan far exceeded those limitations.

Indeed, the vast majority of Dr. Madigan's report is based on information that Dr. Madigan had access to well before the initial deadline for Plaintiffs' expert reports.  Plaintiffs have thus used Dr. Madigan as a vehicle to improperly revisit issues that were beyond the scope of this Court's Order.  This alone justifies excluding Dr. Madigan's testimony.

Given his lack of epidemiological qualifications and disregard for stipulated limits on his testimony, Dr. Madigan's general causation opinions should be excluded.

## II.    DR. MADIGAN'S CAUSATION OPINION IS PURE SPECULATION AND IS NOT BASED ON ANY RELIABLE SCIENTIFIC METHOD- OLOGY.

Dr. Madigan's primary report offers no discernible methodology as to how he reached his causal conclusion.  He summarily finds that ███████████ ████████████████████████████████████  This is not, however, a verifiable standard, one that allows the Court to "undertake an independent analysis of each step in the logic leading to the expert's conclusions."  *Hendrix*, 255 F.R.D. at 578.

It is only in his rebuttal report that ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ However—as Dr. Madigan acknowledges—the FDA did not reach any conclusion regarding causation between Abilify and impulse control disorders.  Ex. C, Madigan Dep. at 269:3-6.   Yet Dr. Madigan testified that ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████  Dr. Madigan cannot claim to "mirror" the FDA's methodology but reach a different conclusion using identical information.

Regardless, Dr. Madigan uses none of the recognized indispensable method-ologies—epidemiological evidence, dose-response, and background risk of dis-ease—to form his opinion. *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1308 (11th Cir. 2014). ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

Moreover, he does not use the Etminan study to prove causation. He merely attempts to bolster the study. He claims that ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ But this is inappropriate. Reliable epide-miology allows secondary methodologies to be considered, not vice versa. *See Chapman*, 766 F.3d at 1308 (11th Cir. 2014).

Dr. Madigan purports that ████████████████████████████████████

████████████████████████████████████████████████████████████But for this "weight-of-the-evidence methodology" to be anything more than "a mere con-clusion-oriented selection process that weighs more heavily those studies that sup-ported an outcome," requires that "there [] be a scientific method of weighting that is used and explained." *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 607 (D.N.J. 2002). Here, he does no such thing.

9

The Court "cannot make up for the scientific leaps required to reach a conclusion on causation simply by viewing all of [Dr. Madigan's] evidence as a whole." *Kilpatrick*, 2009 WL 2058384, at *9.  His opinion should be excluded.

## III.   DR. MADIGAN'S OPINION THAT THE ETMINAN STUDY IS SCIENTIFICALLY AND METHODOLOGICALLY SOUND IS INVALID.

Dr. Madigan's attempts to save the Etminan study fall far short of science and ignore the serious concerns that he has previously raised about administrative database studies.

As a threshold matter, the Etminan study is so riddled with flaws as to be inherently unreliable, no matter what Dr. Madigan says about it.  *See* MSJ Br. at 14-16.  But for Dr. Madigan in particular, his "expert" views of the Etminan study cannot be reconciled with his published opinions, which are categorically critical of such studies.  Where an expert "violates his own standard of proper methodology," it suggests that the expert "does not apply the same rigor in the courtroom that he would apply to his [scientific] endeavors."  *In re Rezulin*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004).  On this basis alone, his opinion should be excluded.  *Id*.

### A.   Dr. Madigan's defense of the Etminan study is untenable in light of his published research.

In defense of the Etminan study, Dr. Madigan selectively cites to his own published research regarding observational database studies.  *See* Ex. A, Madigan Rep. at 22 n.61 (citing Ex. G, Schuemie et al., *Interpreting Observational Studies:*

*Why Empirical Calibration is Needed to Correct p-Values*, Stat. in Med. 33(2), 209-218 (2014)); *id.* at 22 n.62 (citing Ex. H, Madigan et al., *Empirical Performance of the Case-Control Method: Lessons for Developing a Risk Identification and Analysis System*, Drug Safety 36(1), 73-82 (2013)).   But Dr. Madigan does not bring his published criticisms of database studies to bear here.

As an independent scientist, Dr. Madigan has for years studied the biases and errors in observational database studies.  Ex. C, Madigan Dep. at 19:9-16; Ex. A, Madigan Rep. at App. 1.  Dr. Madigan and his co-authors discovered a number of significant findings, including that database studies, like the Etminan study, are substantially biased and likely to produce erroneous results.  *See, e.g.*, Ex. I, Madigan et al., *A Systematic Statistical Approach to Integrating Information from Observational Studies*, Ann. Rev. of Stat. and Its Application 1, 21 (2013).  More-over, he has explained that the traditional tools for correcting those biases are often unsuccessful.  Ex. I, Madigan et al. (2013), at 27; Ex. G, Schuemie et al. (2014), at 210.  Dr. Madigan also found that incredibly, "20%-40% of observational database studies can swing from statistically significant in 1 direction to statistically signifi-cant in the opposite direction" simply "depending on the choice of database."  Ex. J, Madigan et al., *Evaluating the Impact of Database Heterogeneity on Observational Study Results*, Am. J. of Epidemiology 178(4), 648-49 (2013).  In-deed, in his analysis of an association between a negative control, salmeterol, and

acute myocardial infarction, Dr. Madigan found that three of the five administrative claims and electronic health record databases yielded statistically significant positive findings, while the other two did not, despite holding study design constant. Ex. H, Madigan et al. (2013), at S78. Due to this substantial data heterogeneity between different administrative claim or electronic health record databases, Dr. Madigan recommended that "where possible, studies should examine multiple sources to confirm that the significant findings are consistently identified, or that results are at least consistent across databases." Ex. J, Madigan et al. (2013), at 650.[2]

Dr. Madigan has examined various study designs for these databases, including the case control design used by the Etminan study, and assessed their predictive accuracy in determining whether a drug is associated with a particular outcome. He has found that the case control method "often has poor performance" and is "the equivalent of random guessing."[3] Ex. H, Madigan et al. (2013), at S76.

---

[2] Dr. Madigan selectively cites to a number of other publications, but ignores critiques of observational database studies contained therein as well. *See, e.g.*, Ex. K, Trifirò & Sultana, *The Role of Healthcare Databases in Pharmacovigilance of Psychotropic Drugs*, Pharmacovigilance in Psychiatry, 90 (2016) ("Nevertheless, it is to be considered that in any case a single observational study (not being experimental) cannot establish the causal pathway of a drug-(adverse) event association."); Ex. L, Chan et al., *Adverse drug reactions–examples of detection of rare events using databases*, British J. of Clin. Pharmacology 80(4), 857 (2014) ("the quality of data" in database studies "needs further validation").

[3] ███████████████████████████████████████████████████████████████████████████████████████████████████████████

Footnote continued on next page

Dr. Madigan's research reveals that "the case-control method exhibits positive bias across all outcomes and all databases." *Id.* at S80. In other words, "the case-control method" is likely to find an association between a drug and outcome, where none exists. *Id.*

Dr. Madigan has also studied *p*-value calculations, which are a measure of statistical significance. He has found that, for observational database studies, traditional p-value calculations can attribute statistical significance to erroneous results. Ex. G, Schuemie et al. (2014), at 210. Dr. Madigan and his co-authors noted that their findings "cast doubts on *any observational study* that would claim statistical significance using traditional *p*-value calculations." *Id.* (emphasis added). And Dr. Madigan believes this issue applies to *all* observational studies, noting that "[w]e do not believe that this problem is unique to our three studies, nor do we believe that these study designs are particularly bad designs. . . . We therefore must conclude that this problem is intrinsic to observational studies in general." *Id*.

To correct for systematic errors such as residual confounding and misclassification, as a scientist, Dr. Madigan advocates for use of so-called calibrated *p*-values, which are a better measure of statistical significance than traditional *p*-

---

Footnote continued from previous page

values.  Given the potentially massive prevalence of false positives resulting from observational database studies, Dr. Madigan thus recommends "that observational studies *always* . . . compute calibrated *p*-values."  Ex. G, Schuemie et al. (2014), at 217 (emphasis added); Ex. C, Madigan Dep. at 153:9-24.  Indeed, in response to criticism regarding their calibration approach, Dr. Madigan states that "[i]nterpretation of results of observational studies is *impossible* without quantify-ing the bias, and we currently see empirical calibration as the *only viable means to do this*."  Ex. M, Schuemie et al., *Robust Empirical Calibration of p-Values Using Observational Data: Comment on Limitations of 'Empirical Calibration of p-Values Using Observational Data'*, Stat. in Med., DOI: 10.1002/sim.6977, 3887 (2016) (emphasis added).  And again, Dr. Madigan and his co-authors reaffirm that "[w]e believe empirical calibration should always be used and presented in obser-vational studies."  *Id*.

Despite all this, Dr. Madigan omits from his Etminan study analysis any mention of systematic error in observational database studies and the need for cali-brated *p*-values to reliably interpret the results of such studies.  In addition, despite knowing the flaws in traditional *p*-values, Dr. Madigan actually calculates this very value for the Etminan study and then uses it to claim the study achieved statistical significance.  Ex. A, Madigan Rep. at 24 n.71; Ex. C, Madigan Dep. at 215:16-22.  Reliance on traditional *p*-values is exactly what Dr. Madigan—as a scientist—has

criticized at length, and it is clear that he used a different standard to defend the Etminan study in litigation than the standards he has used in peer-reviewed literature.

> **B.     Madigan's analysis of the Etminan study is unreliable because it fails to properly address the study's substantial flaws.**

Dr. Madigan's analysis of the Etminan study is a one-sided defense, focused only on its "strengths," and failing to address any of its many flaws. This is clearly a litigation-driven methodology, and it does not withstand any degree of scrutiny. *See Norris v. Baxter Healthcare Corp.* 397 F.3d 878, 886 (10th Cir. 2005).

*First,* Dr. Madigan's analysis of the Etminan study fails to address any potential confounders that were not controlled for or otherwise addressed. Dr. Madigan has observed in his published research that, "[i]n the context of drug safety analyses, one of the most challenging issues is confounding by indication, i.e., a situation in which the indication for the medical product is also an independent risk factor for the outcome." Ex. I, Madigan et al. (2013), at 13. In such cases, "a medical product can spuriously appear to be associated with the outcome when no appropriate control for the underlying condition exists, and confounding may persist despite advanced methods for adjustment." *Id*.

Most significantly, Dr. Madigan did not analyze whether the Etminan Study failed to control for major depressive disorder ("MDD"), one of the indications for aripiprazole. At his deposition, Dr. Madigan ███████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████ This is particularly re-

vealing, given that Dr. Madigan cited in his report two articles on the association

between MDD and pathological gambling.  Ex. A, Madigan Rep. at 26 (citing Ex.

N, Kennedy et al., *Frequency and Correlates of Gambling Problems in Outpatients*

*with Major Depressive and Bipolar Disorder*, Canadian J. of Psychiatry 55(9),

568-574 (2010); Ex. O, Quilty et al., *The Prevalence and Course of Pathological*

*Gambling in the Mood Disorders*, J. Gambl. Study 27, 191-201 (2010)).  These

studies show that pathological gambling occurs at the roughly the same rate among

MDD patients as it does among those with bipolar disorder.  Ex. N, Kennedy et al.

(2010), at 573; Ex. O, Quilty et al. (2010), at 197).  When confronted with these

studies, Dr. Madigan ████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████

Dr. Madigan similarly failed to address several other known confounders not

controlled for in the Etminan study, including alcohol or drug use, other mood dis-

orders, anxiety, prior gambling history, familial and genetic factors, and nicotine

dependence.  Ex. U, American Psychiatric Association, *Diagnostic and Statistical*

*Manual of Mental Disorders*, 588-89 (5th ed. 2013) ("DSM-5").

*Second*, similarly glaring is Dr. Madigan's failure to address possible investigator bias in the study.  Despite reviewing Dr. Etminan's deposition transcript prior to writing his report, Ex. C, Madigan Dep. at 225:4-6, Dr. Madigan fails to even mention that investigator biases might implicate the study's outcome.  *See* MSJ Br. at 16-18, 25-26.  Notwithstanding Dr. Madigan's assertion that "███████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████, he says nothing about the potential conflicts from Dr. Etminan's use of the Aboutlawsuits.com website and his contact with Plaintiffs' counsel prior to beginning his study, Ex. E, Etminan Dep. at 103:9-104:10, 105:1-6, 110:5-8; *see also* MSJ Br. at 14 (failure to disclose these contacts co-authors).

*Third*, Dr. Madigan fails to properly address potential misclassification bias arising from the failure of the Etminan study to validate diagnostic codes.  Plaintiffs' expert Dr. Luepker specifically noted that ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████  In response to this flaw, however, Dr. Madigan simply asserts that ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ But Dr.

Madigan fails to provide any semblance of scientific support for this assumption and how, without the benefit of the underlying data, he could determine whether the bias would favor a particular result.

*Fourth*, Dr. Madigan contends that ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████ However, Dr. Madigan later conceded that ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████

Importantly, Dr. Madigan admits that ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ Instead, Dr. Madigan ████████████████████████████████████ ████████████████████████████████████████████████

████ The Eleventh Circuit has made clear that under *Daubert*, an expert must "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 119 S. Ct. 1167 (1999)).  Dr. Madigan has failed to do so and his opinions warrant exclusion.

## IV.   DR. MADIGAN'S DISPROPORTIONALITY ANALYSES ARE NOT PROOF OF CAUSATION.

Dr. Madigan agrees that ███████████████████████████

███████████████████████████ As his report states, t████████████

███████████████████████████████████████████

██████ ███████████████████████████

███████████████████████████████

██████████ These concessions, however, do not stop him from considering it

███████████████████████████████

██████ Courts and the FDA, however, agree that this evidence is "insufficient proof of general causation."  *Chapman*, 766 F.3d at 1308; *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1199 (11th Cir. 2002) (holding that it is "only reported data, not scientific methodology" and thus are "inadequate" to "demonstrate a [causal] relationship between a drug and potential side effect.").

*First*, even the FDA agrees that the FAERS data suffers from severe biases that make it unreliable.  Ex. Q, FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (2005), at 9 ("voluntary adverse event reporting systems such as AERS or VAERS are subject to a variety of reporting biases.").  Specifically, the FDA notes that reports "could reflect con-

comitant treatment, not the product itself, and other factors, including the disease being treated, other comorbidities or unrecorded confounders." *Id.* The database "may be affected by the submission of incomplete or duplicate reports, under-reporting, or reporting stimulated by publicity or litigation." *Id.* at 12. Dr. Madigan acknowledges that ███████████████████████████████████████ █████████████████████████████████████

*Second*, those biases are reflected in disproportionality analyses because it is only "a measure of a statistical association within a collection of AE/ADR reports, and it is not a measure of causality." Ex. R, Dal Pan et al., *Postmarketing Spontaneous Pharmacovigilance Reporting Systems*, Pharmacoepidemiology (5th ed. 2012), at 147. Plaintiffs' expert Dr. Glenmullen agrees. An article that he co-authored explains that disproportionality analyses "share the limitations of spontaneous adverse event reports." Ex. S, Moore et al., *Reports of Pathological Gambling, Hypersexuality, and Compulsive Shopping Associated with Dopamine Receptor Agonist Drugs*, 174 JAMA Int'l Med. 1930, E4 (2014). Because these analyses contain the "inherent biases" of the adverse event reports they "cannot be relied upon to form causation opinions." *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160 (S.D. Fla. 1996), *aff'd*, 158 F.3d 588 (11th Cir. 1998). Courts have excluded expert opinions that "rel[y] on [this] data" because it "lacks the indicia of scientific reliability." *McClain*, 401 F.3d at 1250. The same is true here.

## V.   DR. MADIGAN'S CURSORY TREATMENT OF CASE REPORTS DOES NOT PROVE CAUSATION

As Dr. Madigan himself admits, ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ Defendants agree.  So

do the courts.  *Chapman*, 766 F.3d at 1308; *Sutherland v. Matrixx Initiatives, Inc.*,

2006 WL 6617000, at *7, *9 (N.D. Ala. Nov. 7, 2006) ("[A]s is always true of case

reports, there are inherent methodological concerns about their significance.").

Case reports are insufficient to prove causation.  *Chapman*, 766 F.3d at

1308.  They are "[u]ncontrolled anecdotal information [that] offers one of the least

reliable sources to justify opinions about both general and individual causation."

*McClain*, 401 F.3d at 1250.  They "do not rule out the possibility that the effect . . .

is simply idiosyncratic or the result of unknown confounding factors."  *Rider*, 295

F.3d at 1199.  As a result, "case reports raise questions; they do not answer them."

*McClain*, 401 F.3d at 1254.

Dr. Madigan concludes that ███████████████████████

██████████████████████████████████████████████████

████████████████████████████ His assertion is belied by his testimony.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ Had he actually performed such a review, he would have discovered

21

the 2014 Gaboriau study—relied on by Plaintiffs' other experts—that conducted an analysis of possible association between aripiprazole and pathological gambling for all case reports existing at that time.  Ex. T, Gaboriau et al., *Aripriprazole: A New Risk Factor for Pathological Gambling? A Report of 8 Case Reports*, Addictive Behaviors 39, 562-565 (2014).  When confronted with the study, Dr. Madigan conceded that ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

Indeed, the FDA guidance materials that Dr. Madigan expressly relies on note that "[f]or any individual case report, it is rarely possible to know with a high level of certainty whether the event was caused by the product" and that "[r]igorous pharmacoepidemiologic studies . . . are usually employed to further examine the potential association."  Ex. Q, FDA Guidance for Industry (2005), at 9.

## VI.   DR. MADIGAN'S OPINION THAT RANDOMIZED CLINICAL TRIAL DATA IS NOT EVIDENCE OF ABSENCE FAILS

Dr. Madigan observes that ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ Not so.

As Dr. Madigan admits, ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ This is pure speculation, and it should be discarded as such.

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1305 (11th Cir. 1999) (excluding

"unscientific speculation offered by a genuine scientist").

Dr. Madigan's hypothesis that ████████████████████████████

██████████████████████ fares no better. ███████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ ████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████ *Second,* this does not show a

23

"trend," which is "the general movement over time of a statistically detectable change." Trend, Merriam-Webster.com (2017), https://www.merriam-webster.com/dictionary/trend. The cited internal presentation contains no temporal information, and thus, Dr. Madigan cannot use the presentation to derive a trend from the data.

## CONCLUSION

For all these reasons, the Court should exclude Dr. Madigan's expert testimony.

Respectfully submitted,

*s/ Larry Hill*
Larry Hill (Florida Bar No. 173908)
Charles F. Beall, Jr. (Florida Bar No. 66494)
Kimberly S. Sullivan (Florida Bar No. 101408)
MOORE, HILL & WESTMORELAND, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola, FL 32502
850-434-3541
lhill@mhw-law.com
ljohnson@mhw-law.com
cbeall@mhw-law.com
ksullivan@mhw-law.com

Anand Agneshwar *(pro hac vice)*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
212-836-8000
anand.agneshwar@apks.com

Matthew A. Eisenstein *(pro hac vice)*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
202-942-6606
matthew.eisenstein@apks.com

Barry J. Thompson (*pro hac vice*)
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
310-785-4600
barry.thompson@hoganlovells.com

Lauren Colton (*pro hac vice*)
HOGAN LOVELLS US LLP
100 International Drive, Suite 200
Baltimore, Maryland 21202
410-659-2700
lauren.colton@hoganlovells.com

*Attorneys for Defendant Bristol-Myers Squibb Company*

*s/ Matthew A. Campbell*
Matthew A. Campbell (*pro hac vice*)
Eric M. Goldstein *(pro hac vice)*
Rand K. Brothers *(pro hac vice)*
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
202-282-5848
macampbe@winston.com
egoldstein@winston.com
rbrothers@winston.com

Luke A. Connelly (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
212-294-6882
lconnell@winston.com

26

Hal K Litchford
Kelly Overstreet Johnson
Russell Bradbury Buchanan
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
101 N Monroe Street, Suite 925
Tallahassee, FL 32301
850-425-7500
kjohnson@bakerdonelson.com
rbuchanan@bakerdonelson.com
hlitchford@bakerdonelson.com

*Attorneys for Defendants Otsuka Pharmaceutical Co., Ltd. and Otsuka America Pharmaceutical, Inc.*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)</u>

Pursuant to Local Rule 7.1(B), counsel for Defendants certify that they contacted counsel for Plaintiffs regarding the relief requested in the foregoing motion. Plaintiffs do not consent to the relief requested.

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

I HEREBY CERTIFY that this brief complies with the word limit of Local Rule 7.1(F) and contains 5,460 words, excluding the parts exempted by that Rule.

*/S/ Larry Hill*
Larry Hill