# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: ABILIFY (ARIPIPRAZOLE) PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to All Cases | Case No.: 3:16-md-2734<br><br>Chief Judge M. Casey Rodgers<br>Magistrate Judge Gary Jones |

## DEFENDANTS OTSUKA AMERICA PHARMACEUTICAL, INC. AND OTSUKA PHARMACEUTICAL CO., LTD.'S RESPONSE TO PLAINTIFFS' BRIEF FOR "LIMITED" REXULTI® DISCOVERY

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................1

ARGUMENT ..............................................................................3

I.      PLAINTIFFS' "MOTIVE AND INTENT" THEORIES LACK ANY
        FACTUAL OR LEGAL BASIS ........................................................4

    A.  Rexulti and Abilify are different drugs with different pharmacological
        profiles.................................................................6

    B.  ███████████████████████████████████████████████
        ████████████████████████████...................................10

    C.  Abilify safety and labeling documents confirm that Rexulti played no part
        in Defendants' Abilify labeling decisions.........................12

    D.  The documents reflecting ███████████████████████████
        ████████████████████ make no mention of Rexulti. .................14

    E.  BMS has never had a financial interest in Rexulti......................15

II.     REXULTI DISCOVERY IS IRRELEVANT TO GENERAL CAUSATION
        FOR ABILIFY ..............................................................16

CONCLUSION ............................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*287 Franklin Ave. Residents' Ass'n v. Meisels*,
  2012 WL 1899222 (E.D.N.Y. May 24, 2012) ......................................................4

*Bright v. Frix*,
  2016 WL 1011441 (M.D. Fla. Jan. 22, 2016) ......................................................3

*EmployBridge, LLC v. Riven Rock Staffing, LLC*,
  2016 WL 9281448 (D.N.M. Dec. 16, 2016).........................................................4

*Kennedy v. Collagen Corp.*,
  161 F.3d 1226 (9th Cir. 1998) ...........................................................................17

*In re Lupron Mktg. & Sales Practices Litig.*,
  2004 WL 764454 (D. Mass. Mar. 17, 2004) ........................................................9

*Lyman v. Pfizer*,
  2012 WL 2971550 (D. Vt. July 20, 2012)...........................................................17

*Neogenix Oncology, Inc. v. Gordon*,
  2017 WL 1207558 (E.D.N.Y. Mar. 31, 2017).......................................................4

*In re Neurontin*,
  612 F. Supp. 2d 116 (D. Mass. 2009)..................................................................17

*In re Phenylpropanolamine*,
  2003 WL 22417238 (N.J. Super. Law Div. July 21, 2003)................................17

*Ranbaxy Labs., Inc. v. First Databank, Inc.*,
  2014 WL 12617741 (M.D. Fla. June 16, 2014) ....................................................9

*Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*,
  1991 WL 183842 (E.D. Pa. Sept. 16, 1991).........................................................5

*In re Richardson-Merrell, Inc.*,
  624 F. Supp. 1212 (S.D. Ohio 1985), *aff'd sub nom. In re
  Bendectin Litig.*, 857 F.2d 290 (6th Cir. 1988)...................................................9

*Rider v. Sandoz Pharm. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ............................................................9

*Robinson v. Horizon Blue Cross-Blue Shield of N.J.*,
   2013 WL 6858956 (D.N.J. Dec. 23, 2013), *aff'd*, 674 F. App'x 174
   (3d Cir. 2017) ........................................................................................5

*In re Skelaxin Antitrust Litig.*,
   292 F.R.D. 544 (E.D. Ten. 2013) ..........................................................9

*Small v. Amgen, Inc.*,
   2016 WL 7228863 (M.D. Fla. Sept. 28, 2016) .....................................10

*Tottenham v. Trans World Gaming Corp.*,
   2002 WL 1967023 (S.D.N.Y. June 21, 2002) .....................................3, 4

*UnitedHealthcare of Fla., Inc. v. Am. Renal Assoc., LLC*,
   2017 WL 6210835 (S.D. Fla. Dec. 7, 2017) ...........................................5

*Wells v. SmithKline Beecham Corp.*,
   601 F.3d 375 (5th Cir. 2010) ...............................................................16

*In re Zoloft Prods. Liab. Litig.*,
   26 F. Supp. 3d 449 (E.D. Pa. 2014) .....................................................16

## Other Authorities

Fed. R. Civ. P. 26(b)(1) .............................................................................3

Defendants Otsuka America Pharmaceutical, Inc. ("OAPI") and Otsuka Pharmaceutical Company, Ltd. ("OPC") (collectively, "Otsuka") submit this supplemental brief in response to Plaintiffs' Brief for "Limited" Rexulti Discovery.[1]

## INTRODUCTION

As the Court well knows, this case is about whether Abilify® caused Plaintiffs to engage in pathological gambling and impulsive behaviors. Yet, throughout this litigation, Plaintiffs have repeatedly sought discovery on a wholly different product, Rexulti®. They have done so despite the undisputed facts that Rexulti is a novel chemical compound that was developed and launched over a decade after Abilify; is covered by different patents than Abilify; underwent its own exhaustive process for obtaining FDA approval, including separate clinical trials and regulatory submissions; is not approved by the FDA for the same indications as Abilify; and is not and never has been developed, manufactured, marketed, or sold by Defendant Bristol-Myers Squibb Co. ("BMS").

Plaintiffs have nevertheless advanced a series of theories for why Rexulti discovery might be relevant here, none of which is supported by fact or law. They first claimed that Rexulti discovery could show when Defendants were on notice of the link between Abilify and impulse behaviors; the Court twice rejected that

---

[1] This Response to Plaintiffs' Brief for "Limited" Rexulti Discovery supplements and incorporates Defendants' prior briefing on possible discovery into Rexulti. *See* ECF Nos. 540, 862.

argument. *See* Omnibus Order at 23-24 (ECF No. 549), Order at 7-9 (ECF No. 610). Plaintiffs then argued that Rexulti discovery was relevant to general causation in light of Otsuka's voluntary addition of an impulsivity warning to the Rexulti label. But when the Court observed that "[t]here's no epidemiology with Rexulti" and that "it can't be enough to just have a warning," Plaintiffs' counsel conceded that they are "not using Rexulti to prove general causation." **Ex. A**, Abilify 15th CMC Tr., at 17:18-19, 19:1-2, 19:11-12.

Plaintiffs then turned to speculating that Rexulti discovery may show that Defendants "chose not to change the Abilify label in the United States" or "to study the issue of Abilify's association with pathological gambling" "over concerns [] that such a change would negatively impact future Rexulti sales" or threaten FDA approval for Rexulti. *See* Br. 6, 11-12; **Ex. A**, Abilify 15th CMC Tr., at 55:7-14, 56:1-8. But Plaintiffs point to no evidence supporting this theory despite access to tens of thousands of documents detailing Abilify safety and labeling decisions. Those thousands of documents confirm that Rexulti played no part in Abilify labeling decisions. *See infra* Part I.C. Plaintiffs also completely ignore other facts refuting their allegation, including that

- Rexulti and Abilify have different pharmacological profiles,

- ████████████████████████████████████████████████

  ████████████████████████████████

- ████████████████████████████████████████

  ████████████████████████

- BMS has never had a financial interest in Rexulti.

Discovery "is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support." *Tottenham v. Trans World Gaming Corp.*, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002) (quotation marks and citation omitted). Here, Plaintiffs have not and cannot offer even a modicum of objective evidence supporting their "motive and intent" theory, despite having obtained voluminous discovery about Defendants' Abilify labeling decisions.   Accordingly, Otsuka respectfully requests that the Court deny Plaintiffs' request to reopen the Court's prior rulings that Rexulti has no relevance to this case and reject Plaintiffs' "fishing expedition" once and for all.

## ARGUMENT

Under the Federal Rules of Civil Procedure, any discovery sought must be "relevant to any party's claim or defense" *and* "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  The party seeking discovery bears the "burden of proving that the information sought is relevant." *Bright v. Frix*, 2016 WL 1011441, at *1 (M.D. Fla. Jan. 22, 2016); *see also* **Ex. A**, Abilify 15th CMC Tr., at 49:10-12

3

(observing that it is "[Plaintiffs'] burden to convince [the Court] that this discovery should be permitted").

## I.   PLAINTIFFS' "MOTIVE AND INTENT" THEORIES LACK ANY FACTUAL OR LEGAL BASIS

Plaintiffs argue that Rexulti discovery is relevant to "motive and intent" because—they posit—it could reveal that Defendants "chose not to change the Abilify label in the United States" or "to study the issue of Abilify's association with pathological gambling" "over concerns [] that such a change would negatively impact future Rexulti sales" or threaten FDA approval for Rexulti.  Br. 6, 11-12; **Ex. A**, Abilify 15th CMC Tr., at 55:7-14, 56:1-8.

"[T]o establish the necessary relevance element," however, "a party must do more than offer mere speculation or conjecture."  *Neogenix Oncology, Inc. v. Gordon*, 2017 WL 1207558, at *10 (E.D.N.Y. Mar. 31, 2017).  Discovery "is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support." *Tottenham*, 2002 WL 1967023, at *2 (quotation marks and citation omitted); *see also EmployBridge, LLC v. Riven Rock Staffing, LLC*, 2016 WL 9281448, at *4 (D.N.M. Dec. 16, 2016) (denying discovery where "Plaintiffs have failed to demonstrate a modicum of objective support" "for the conspiracy they hypothesize"); *287 Franklin Ave. Residents' Ass'n v. Meisels*, 2012 WL 1899222, at

4

*6 (E.D.N.Y. May 24, 2012) ("Discovery is not to be used as a hunting license to conjure up a claim that does not exist.") (quotation marks and citation omitted).

Moreover, when a party already has received "voluminous discovery" that fails to "contain facts or information that can reasonably support" "highly speculative" theories, it an "abuse of the liberal Rule 26 relevancy standard" "to compel further discovery in hopes that something will be found." *Robinson v. Horizon Blue Cross-Blue Shield of N.J.*, 2013 WL 6858956, at *6 (D.N.J. Dec. 23, 2013), *aff'd*, 674 F. App'x 174 (3d Cir. 2017); *see also UnitedHealthcare of Fla., Inc. v. Am. Renal Assoc., LLC*, 2017 WL 6210835, at *2 (S.D. Fla. Dec. 7, 2017) (denying discovery request based on "nothing more than mere speculation" where "Defendants have already produced thousands and thousands of pages of documents").  As the *Robinson* court explained:

> Here, plaintiff is apparently seeking discovery to support (pre-textual) theories that are highly speculative, at best.   Apparently, the voluminous discovery that plaintiff has already received does not contain facts or information that can reasonably support these theories; and now plaintiff urges this Court to compel further discovery in hopes that something will be found to support his presently unsupported theories …. This is the type of "fishing expedition" that courts typically view as an abuse of the liberal Rule 26 relevancy standard.

2013 WL 6858956, at *6; *see also Rhone-Poulenc Rorer, Inc. v. Home Indem. Co*., 1991 WL 183842, at *3 (E.D. Pa. Sept. 16, 1991) (finding that party's effort to justify "discovery into irrelevant material" based on "speculation about potential bias and motive" was "a fishing expedition").

Here, Plaintiffs have failed to provide even a "modicum of objective support" to raise their speculative theories to the realm of the reasonable despite access to thousands of documents detailing Abilify safety and labeling decisions. Moreover, their theories are contradicted by all the available evidence. Such "fishing expedition[s]," based on mere hunches and rank speculation, are routinely rejected by courts, and Defendants respectfully submit that Plaintiffs' attempt to reopen the Court's earlier well-founded decisions should similarly be rejected.

### A. Rexulti and Abilify are different drugs with different pharmacological profiles.

Plaintiffs' theories hinge on the assumption that Rexulti and Abilify are so similar pharmacologically that any labeling decision for Abilify necessarily would impact Rexulti. *See* **Ex. A**, Abilify 15th CMC Tr., at 36:6-8 ("if [Otsuka] "kn[ew] the mechanism [between Abilify and Rexulti] is the same ... that's kind of how it ties back into the motive and intent"). This is not true, as even the documents Plaintiffs cite in their brief clearly show.

Plaintiffs first contend that "the Rexulti label and the Abilify label" identify "the identical mechanism of action," which they argue "is in fact the D3 receptor." **Ex. A**, Abilify 15th CMC Tr., at 21:25-22:1-7. Even a cursory review of the two labels, however, shows that the medications have different pharmacologic profiles and mechanisms of action, including different binding affinities at D3 receptors. *See* Br., Ex. 7 at 56; Br., Ex. 8 at 19. Similarly, an FDA pharmacology review of

Rexulti—which Plaintiffs themselves cite—noted that Rexulti "showed partial agonistic activity at hD3 receptor [] with ***lower than aripiprazole intrinsic activity***." Br., Ex. 13 at 16 (emphasis added).

The internal documents Plaintiffs cite also show clear pharmacological differences between the two medications. ████████████████████████ ███████████████████████████████████████ (*see* **Ex. A**, Abilify 15th CMC Tr., at 26:13-14), █████████████████████████████████████████ ████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Br., Ex. 9 at OAP_05173997.00030.  All other documents to which Plaintiffs' cite reach similar conclusions.  *See, e.g*., Br., Ex. 10 at 5 (noting Rexulti "has lower

maximal effect on D2 receptors and greater potency to 5-HT1A receptors compared to aripiprazole"); *see also* Br., Ex. 13 at 16-18 (noting that Rexulti "showed partial agonistic activity at hD3 receptor [] with lower than aripiprazole intrinsic activity"). Even one of the third-party articles Plaintiffs trumpet observed that any basis for comparing Rexulti and Abilify is limited, as "[f]uture evidence derived from head-to-head clinical trials" is needed.  Br., Ex. 11 at 5.



Plaintiffs also falsely claim that ███████████████████████ ████████████████████ Br. 8. ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ Br., Ex. 6 at 11.  And, the cited document that refers to Rexulti as a "me too drug" is actually a third-party journal article—not an internal company document.[2]  *See* Br. 7, Ex. 10. *Compare* **Ex. A**, Abilify 15th CMC Tr., 26:13-16 ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

Fundamentally, the documents Plaintiffs cite establish that Rexulti and Abilify are different medications with different pharmacological properties.  Courts

---

[2] This is one of several examples where Plaintiffs mischaracterize either the source or the content of the document on which they rely.

consistently deny discovery into drugs not at issue in the litigation, because even "minor deviations in chemical structure can radically change a particular substance's properties and propensities." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002) (quotation marks and citation omitted); *see Ranbaxy Labs., Inc. v. First Databank, Inc.*, 2014 WL 12617741, at *2 (M.D. Fla. June 16, 2014) (denying motion to compel because "[s]pecific information about other drugs" "is not within the parameters of appropriate discovery"); *In re Skelaxin Antitrust Litig.*, 292 F.R.D. 544, 551 (E.D. Tenn. 2013) (denying discovery on other drugs because "limited relevance" was "outweighed by the burden[]" of producing documents); *In re Lupron Mktg. & Sales Practices Litig.*, 2004 WL 764454, at *1 (D. Mass. Mar. 17, 2004) (denying other-drug discovery and noting that the "court is not unaware that other lawsuits have been filed, many by the same attorneys participating in this case, involving drugs marketed by TAP and other pharmaceutical companies"); *In re Richardson-Merrell, Inc.*, 624 F. Supp. 1212, 1241 (S.D. Ohio 1985) ("not confining discovery to Bendectin and its components alone or in combination with other components would have necessarily opened all of defendant's drugs to discovery— a result that would be truly oppressive and would thwart any attempt at a just, speedy, or inexpensive determination of the action"), *aff'd sub nom. In re Bendectin Litig.*, 857 F.2d 290 (6th Cir. 1988).

This litigation is about only Abilify. Any discovery into Rexulti is simply irrelevant to this case. *See Small v. Amgen, Inc*., 2016 WL 7228863, at *8 (M.D. Fla. Sept. 28, 2016) (holding that evidence about other drugs in the same class as the defendant's drug was not relevant and "tantamount to a fishing expedition").

**B.** 

The facts belie Plaintiffs' allegation that Defendants did not change the Abilify label in the United States for fear it would affect FDA approval of Rexulti.

. *See* **Ex. B**, OAP_06161355-58 (cover letter); **Ex. C**, OAP_06261051.

*See* **Ex. C**, OAP_06261051 at 195.



**Ex. D**, BMS_0001066864 at 7091–7092 (PADER Jan. 2013) (emphases added); **Ex. E**, OAP_08993086 (PADER Jan. 2013 Cover Letter); *see also* **Ex. F**, OAP_09022343 (PADER May 2013 Cover Letter); **Ex. G**, BMS_0001070041 at 0266 (PADER May 2013); **Ex. H**, OAP_09015995 (PADER July 2013 Cover Letter); **Ex. I**, BMS_0001067630 at 7863 (PADER July 2013); **Ex. J**,

OAP_08979770 (PBRER Sept. 2013 Cover Letter); **Ex. K**, BMS_0000028241 at 8252 (PBRER Sept. 2013).

Contrary to Plaintiffs' suggestions, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████

### C.   Abilify safety and labeling documents confirm that Rexulti played no part in Defendants' Abilify labeling decisions.

In response to three rounds of exhaustive discovery requests from Plaintiffs, Defendants have produced tens of thousands of documents on Defendants' safety and labeling decisions with respect to Abilify.  These documents include the relevant meeting minutes of the joint BMS and Otsuka Medical Safety Team; audio recordings of those meetings; documents and communications between Defendants regarding Abilify and its possible link with compulsivity; internal documents and e-mails concerning analyses or studies of any possible link between Abilify and compulsivity; and drafts and communications regarding Defendants' own evaluations of the link.  None of these documents contains even the slightest hint that Rexulti influenced Defendants' safety and labeling decisions.

Tellingly, Plaintiffs fail to cite any safety and labeling documents in their brief—even though these are the obvious documents one would consult to understand why Defendants made their labeling decisions for Abilify.  The closest they come ████████████████████████████████████████████████

 Br., Ex. 17 at 532.

*See* **Ex. L**, OAP_057231100; **Ex. M**, BMS_0000040285 at 287, 314, 354.

Plaintiffs' brief focuses instead on a series of internal and third-party documents that note, unremarkably,

This is neither nefarious nor even surprising, and does nothing to support Plaintiffs' theory that Rexulti influenced Abilify decision-making processes. *See, e.g.*, Br., Ex. 4, 5, 18, 24. To the contrary, Rexulti is not the only medication that Otsuka developed and currently markets. *See* **Ex. N**, Otsuka Holdings 2017 Annual Report, at 40-42. Otsuka's portfolio of pharmaceutical products includes oncological, cardiovascular, and renal products, along with products in other treatment areas. *Id.* Abilify Maintena is currently the company's bestselling medication, with oral aquaretic agent, Samsca/JINARC, close behind. *Id.* Rexulti accounted for only 12%

of Otsuka's pharmaceutical business revenue in 2017. *Id*. And other aspects of Otsuka's business portfolio, such as nutraceuticals, have taken on increased importance in recent years. *See id*. at 25 (discussing past "[d]iversification of business portfolio" and "[r]educing reliance on revenue from Abilify").

**D.    The documents reflecting** █████████████████████████ ████████████████████████████████ **make no mention of Rexulti.**

The extensive discovery in this case also shows that Rexulti had nothing to do

with ███████████████████████████████████████████████████

███████. Defendants produced documents memorializing their analysis of this issue,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ **Ex. O**, OAP_03319333 at 340.

Importantly, ████████████████████████████████████████

███████████████████████████████████████████████████

███████ **Ex. P**, OAP_03328738 at 751. Significantly, ████████████████████

███████ was echoed by Plaintiffs' own expert, Dr. Madigan, who confirmed that a clinical study to determine whether Abilify caused pathological gambling would require an enormous patient population. *See, e.g.*, Madigan Rep. at 26 (ECF No. 598-9) (noting that to achieve 80% power in placebo trials would require 240,307 aripiprazole patient years and 147,028 placebo patient years).

14

### E.     BMS has never had a financial interest in Rexulti.

Finally, it is undisputed that BMS has never had any financial interest in the development, approval, or marketing of Rexulti.  To the contrary, because of its financial stake in Abilify, BMS was (and is) essentially a competitor to Rexulti.  For that reason, Defendants have repeatedly noted that Plaintiffs' theory that Rexulti influenced Abilify labeling decisions is nonsense.

When the Court asked about this at the last case management conference, Plaintiffs' counsel admitted that "I don't have the perfect answer to that question because I haven't seen the documents."  **Ex. A**, Abilify 15th CMC Tr., at 58:5-6.  Counsel similarly offered the factually inaccurate theory that when Defendants were making Abilify labeling decisions, BMS was being considered as a co-promotion partner on Rexulti:  "And in fact there was some discussion I saw in some documents—I can't cite chapter and verses to dates, but Otsuka was trying to figure out who is going to market it for them in the United States because—and they ultimately chose Lundbeck, not Bristol-Myers Squibb."  *Id*. at 57:23-58:4.  Publicly available information, however, shows that Otsuka and Lundbeck had already entered into an agreement for the development and commercialization of Rexulti in 2011—before any of the relevant labeling decisions in this case.

## II.   REXULTI DISCOVERY IS IRRELEVANT TO GENERAL CAUSATION FOR ABILIFY

At the last case management conference, Plaintiffs' counsel conceded that they are "not using Rexulti to prove general causation."  **Ex. A**, Abilify 15th CMC Tr., at 17:18-19, 19:1-2, 19:11-12.  To the extent Plaintiffs continue to argue that Rexulti is relevant to general causation, however, their failure to offer any scientific evidence suggesting that Rexulti can cause pathological gambling is fatal.

As this Court and others have made clear, "extrapolations from drugs within the same class may not support an expert opinion on general causation unless other reliable scientific evidence establishes the validity of the analogy."  *Daubert* Order 25 (ECF No. 796); *see id*. at 159 ("the *in vivo* studies concerning other drugs (*i.e*., not Abilify) are inadmissible"); OAPI & OPC Br. 5-8 (ECF No. 862) (collecting cases, including *In re Zoloft Prods. Liab. Litig*., 26 F. Supp. 3d 449, 458 (E.D. Pa. 2014) ("Even assuming sound evidence of a common biological mechanism by which all SSRIs could plausibly impact fetal development," "such evidence would only give rise to the *hypothesis* of a class-wide effect … because even small differences in chemical structures can result in different [adverse] effects.")); *Wells v. SmithKline Beecham Corp*., 601 F.3d 375, 380 (5th Cir. 2010) (rejecting analogy from study '"represent[ing] a class association"' because it did not represent a controlled trial for the drug at issue, Requip).

The few cases Plaintiffs cited in their original brief do not help them.  *See* Br. 9.  For example, *Kennedy v. Collagen Corp*. did not involve analogies between two different drugs.  Rather, the "analogical reasoning" affirmed in that case involved analogizing from, among other things, a study focusing on the same active ingredient as the product at issue.  161 F.3d 1226, 1228-30 (9th Cir. 1998).  Here, Plaintiffs seek to analogize between the two *different* active pharmaceutical ingredients of Abilify and Rexulti.  In *Lyman v. Pfizer*, the court did not focus on the drug analogy (it is unclear whether the analogy was challenged), but rather whether the incidence rate of a particular condition in a population taking the subject drug versus another type of drug was relevant.  The court noted that, there, general causation "[wa]s not particularly controversial."  2012 WL 2971550, at *3 (D. Vt. July 20, 2012).  And in *In re Neurontin*, the court found that "Plaintiffs' experts present[ed] convincing scientific evidence as to why the analogy" "makes sense and is sufficiently reliable." 612 F. Supp. 2d 116, 142 (D. Mass. 2009); *see In re Phenylpropanolamine*, 2003 WL 22417238, at *30 (N.J. Super. Law Div. July 21, 2003) (relying on strength of scientific literature and "extremely persuasive" parallel federal-court decision to allow testimony on similarities between "closely related drugs").  Plaintiffs here cite no scientific evidence, and their arguments warrant no discovery into Rexulti.

17

## CONCLUSION

For the foregoing reasons, Plaintiffs' request should be denied and no Rexulti

discovery permitted.


Respectfully submitted,


/s/ Matthew A. Campbell
Matthew A. Campbell (pro hac vice)
Eric M. Goldstein (pro hac vice)
Matthew M. Saxon (pro hac vice)
Rand K. Brothers (pro hac vice)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC  20006
Phone: 202.282.5848
Fax: 202.282.5100
macampbe@winston.com

Luke A. Connelly (pro hac vice)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Phone: 212.294.6882
Fax: 212.294.4700
lconnell@winston.com


Hal K. Litchford (Fla. Bar No. 272485)
Kelly Overstreet Johnson (Fla. Bar No.
0354163)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

18

101 N. Monroe Street, Suite 925
Tallahassee, FL 32301
Phone: 850.425.7500
Fax: 850.270.6661
kjohnson@bakerdonelson.com
hlitchford@bakerdonelson.com

*Attorneys for Defendants Otsuka*
*America Pharmaceutical, Inc., and*
*Otsuka Pharmaceutical Co., Ltd.*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I hereby certify that this brief complies with the word limit of Local Rule

7.1(F) and contains 3,806 words, excluding the parts exempted by that Rule.

/s/ Matthew A. Campbell
Matthew A. Campbell

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2018, I caused a copy of the foregoing

to be filed through the Court's CM/ECF system, which will serve all counsel of

record.

/s/ Matthew A. Campbell
Matthew A. Campbell