## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

IN RE: ABILIFY (ARIPIPRAZOLE)
PRODUCTS LIABILITY
LITIGATION

Case No. 3:16-md-2734

Judge M. Casey Rodgers

This Document Relates to All Cases

Magistrate Judge Gary R. Jones

### REPORT AND RECOMMENDATION OF SPECIAL MASTER ELLEN REISMAN REGARDING AWARD OF COMMON BENEFIT FEES AND EXPENSES

## I.    Introduction and Summary of Conclusions

Common Benefit Fund Order No. 1, entered by this Court on February 21, 2017, appointed Randy Sansom as CPA and me as Common Benefit Special Master.[1] Among other things, it directed Mr. Sansom and me to perform the tasks described in that Order, to make reports to the Court and to the Plaintiffs' Fees and Common Benefit Fund Committee ("PFFC"), and to ensure the accuracy of the "submissions and all accounts and records."[2]  Over the last nearly three years, during the course of the Abilify litigation, Mr. Sansom and I have performed those duties.

As the Order issued by this Court on February 25, 2019 states, early in 2019, the Parties reached a settlement and entered into a Confidential Master Settlement

---

[1] Common Benefit Fund Order No. 1 at 2, Feb. 21, 2017, ECF No. 200 ("CBO 1").
[2] *Id.*

Agreement.[3]  The participation thresholds for that settlement have been reached and certified by Defendants, and the funds are now available for payment of both participating claimants and the Plaintiffs' attorneys whose work contributed to the common benefit.  Common Benefit Fund Order No. 6, issued by the Court on June 5, 2019, specifies the process by which Plaintiffs' counsel may seek reimbursement of expenses and awards of fees relating to their common benefit work.[4]  CBO 6 provides that I am responsible for recommending an allocation of awards of attorneys' fees and costs, in consultation with the PFFC, Co-Lead Counsel, and the CPA.[5]  It further provides that I am to provide the Court with a Report & Recommendation setting forth my recommendations as to reimbursement of costs and apportionment of attorneys' fees for common benefit work.[6]

Over the last several months, as described below, law firms making requests for awards of common benefit expense reimbursements and fees have submitted Applications and made oral presentations pursuant to the requirements of CBO 6. Additionally, I have consulted with the PFFC, Mr. Sansom, and Co-Lead Counsel, and I have had discussions with numerous Plaintiff Leadership firms.  Having received information from these many sources, on November 5, 2019, I circulated

---

[3] Order Regarding Settlement Agreement and Deadlines, Feb. 25, 2019, ECF No. 1135.

[4] *See* Common Benefit Fund Order No. 6, June 5, 2019, ECF No. 1145 ("CBO 6").

[5] *Id.* at 5.

[6] *Id.*

to all law firms that applied for common benefit expense or fee awards a confidential proposal for an agreed-upon allocation of fees (by percentage of the total). I requested that any firm objecting to this proposal notify me by the end of the day on November 7, 2019. No firm objected, and many expressed their support for it. Accordingly, my recommendation in this Report & Recommendation regarding the common benefit fee allocation is one that has been accepted by all affected firms.

As described in greater detail below at Section V, it appears likely that a total of approximately $18,940,000.00 will be available to reimburse firms for their capital contributions, to reimburse firms for common benefit expenses appropriately submitted as held costs, and to award common benefit fees. As described below, the firms seeking common benefit awards performed a significant volume of work, resulting in a successful global settlement in a tort that presented challenging legal and scientific issues.

My recommendations are as follows:

1. All firms making capital contributions to the Litigation Fund[7] should have the full amount of those contributions reimbursed to them (without interest). Those capital contributions total $3,610,000.00.

2. All common benefit expenses appropriately submitted as held costs (pursuant to CBO 1) should be reimbursed to the firms claiming them,

---

[7] Established pursuant to CBO 1 at 2-3.

without further review by myself or the CPA.  Those held costs total $1,539,845.35.

3.  Common benefit attorneys' fees should be awarded to each law firm according to the percentages set forth in the agreed-upon allocation provided herein.

## II.    Abilify Litigation Background

### A. Establishment of the Multidistrict Litigation

On October 3, 2016, the Judicial Panel on Multidistrict Litigation centralized 22 Abilify cases pending in various federal courts and transferred those cases to the United States District Court for the Northern District of Florida, thus creating MDL 2734, *In re: Abilify (Aripiprazole) Products Liability Litigation*.[8]

On October 19, 2016, the Court appointed Kristian Rasmussen of Cory Watson Attorneys ("Cory Watson") and Gary Wilson of Robins Kaplan LLP ("Robins Kaplan") as interim Co-Lead Counsel for Plaintiffs, and appointed Bryan Aylstock of Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO") as interim Liaison Counsel.[9]  Subsequently, after reviewing attorney applications for leadership roles, the Court appointed Plaintiffs' Leadership on December 16, 2016.[10]   On

---

[8] Transfer Order, Oct. 3, 2016, ECF No. 1.
[9] Order Establishing Interim Procedures at 2, Oct. 19, 2016, ECF No. 8.
[10] Order Appointing Leadership Counsel, Dec. 16, 2016, ECF No. 143.

February 24, 2017, at the request of Plaintiffs' Leadership, the Court added two additional Plaintiffs' attorneys to the Joint Science and Expert Sub-Committee and two additional Plaintiffs' attorneys to the Joint Discovery Committee.[11]  As a result of these two Orders, the Plaintiffs' Leadership consisted of the following:

| Firm | Attorney | Position(s) |
|---|---|---|
| Robins Kaplan | Gary L. Wilson | Co-Lead Counsel |
| | Tara D. Sutton | Joint Discovery Committee |
| | | Science and Expert Sub-Committee |
| | | Joint Settlement Committee |
| | Munir R. Meghjee | Plaintiffs' Federal/State Liaison Counsel |
| Cory Watson | Kristian Rasmussen | Co-Lead Counsel |
| | Stephen Hunt, Jr. | Joint Discovery Committee |
| | Ernest Cory | Joint Settlement Committee |
| Aylstock, Witkin, Kreis & Overholtz | Bryan Aylstock | Liaison Counsel |
| | | Plaintiffs' Fees and Common Benefit Fund Committee |
| | Stephen H. Echsner | Joint Discovery Committee |
| Lieff Cabraser | Lexi J. Hazam | Plaintiffs' Executive Committee |
| | | Joint Discovery Committee |
| | | Science and Expert Sub-Committee |
| | Donald Arbitblit | Science and Expert Sub-Committee |
| Levin Papantonio | Troy A. Rafferty | Plaintiffs' Executive Committee |
| Zimmerman Reed | J. Gordon Rudd, Jr. | Plaintiffs' Executive Committee |
| Kirtland & Packard | Behram V. Parekh | Plaintiffs' Steering Committee |
| | | Joint Discovery Committee |
| | | Electronically Stored Information Sub-Committee |
| Pittman, Dutton & Hellums | Chris T. Hellums | Plaintiffs' Steering Committee |
| | | Plaintiffs' Fees and Common Benefit Fund Committee |

---

[11] Order, Feb. 24, 2017, ECF No. 208.

| Firm | Attorney | Position(s) |
|------|----------|-------------|
| Farr Law Firm | George T. Williamson | Plaintiffs' Steering Committee |
| | | Joint Discovery Committee |
| | | Electronically Stored Information Sub-Committee |
| Napoli Shkolnik | Jennifer Liakos | Plaintiffs' Steering Committee |
| | | Science and Expert Sub-Committee |
| Childers, Schlueter & Smith | M. Brandon Smith | Plaintiffs' Steering Committee |
| GoldenbergLaw | Marlene J. Goldenberg | Plaintiffs' Steering Committee |
| Berger & Montague | Shanon J. Carson | Plaintiffs' Steering Committee |

### B. Key Litigation Developments

Plaintiffs' counsel worked quickly and diligently, conducting discovery and preparing their case in a fast-paced litigation with ambitious deadlines. It was apparent early in the litigation that establishing general causation would be a critical task for Plaintiffs, and as such, the bulk of the first eight to nine months of the litigation centered around preparation for general causation/*Daubert* hearings. The *Daubert* evidentiary hearing spanned four days and included Plaintiffs' counsel presenting four witnesses for live testimony: Antoine Bechara, Joseph Glenmullen, Eric Hollander, and David Madigan.[12] Defendants also presented four witnesses for live testimony: Pierre Blier, Marc Potenza, Douglas Weed, and Catherine

---

[12] *See* Minute Entries for Causation/*Daubert* Hearing, July 31, 2017, Aug. 1, 2017, Aug. 2, 2017, Aug. 3, 2017, ECF Nos. 497-500; Joint Witness List, Aug. 3, 2017, ECF No. 500-1.

Winstanley.[13]  Preparation for the *Daubert* hearing was a significant undertaking which involved reviewing and evaluating thousands of documents, days spent preparing for, taking, and defending depositions, crafting and refining litigation strategy, and extensive briefing requiring the drafting of several *Daubert* motions, oppositions, and replies.

After hearing the Parties' arguments and reviewing the voluminous record, the Court, in a 164 page order indicative of the complexity of the issue and reflective of the amount of preparation and effective advocacy by Plaintiffs' counsel, concluded that "Plaintiffs have satisfied their burden to demonstrate that a genuine dispute of material fact exists as to whether Abilify can cause uncontrollable impulsive behaviors in individuals taking the drug," and thus denied Defendants' Motion for Summary Judgment.[14]  This Order was a pivotal development in Plaintiffs' case and, had the Court reached a different result, there would likely have been no recovery at all for Plaintiffs.

Concurrent with discovery and preparation related to general causation and the *Daubert* hearing, the Court selected the six cases originally filed in the Northern

---

[13] Joint Witness List, Aug. 3, 2017, ECF No. 500-1.
[14] Amended Order at 2, Mar. 15, 2018, ECF No. 796.  The Court's original Order was entered January 22, 2018, ECF 671, but was under seal.  The Amended Order is a redacted version omitting references to sealed materials.

District of Florida for case-specific work up ("First Trial Pool").[15]  On March 23, 2017, the Court entered the Parties' Stipulated Order, which set deadlines to complete document discovery, identify experts and produce expert reports regarding specific causation, complete depositions (fact and expert), and file dispositive motions.[16]  As discovery progressed, the First Trial Pool was whittled to three cases by June 2017:  *Lilly*, *Viechec*, and *Lyons*.[17]  In March 2018, the Court randomly selected the order of the cases for trial[18] and set trial dates as follows: *Lyons* for June 18, 2018; *Viechec* for August 6, 2018; and *Lilly* for August 27, 2018.[19]  On April 27, 2018, less than two months before the *Lyons* trial was to commence, the Parties, after a successful mediation, resolved the First Trial Pool cases.[20]

---

[15] Case Management Order No. 2, Feb. 2, 2017, ECF No. 182. Those cases were: *Eckert v. Bristol-Myers Squibb Company et al.*, 3:16cv536; *Johnson v. Bristol-Myers Squibb Company et al.*, 3:16cv594; *Perez v. Bristol-Myers Squibb Company et al.*, 3:16cv251; *Viechec v. Bristol-Myers Squibb Company et al.*, 3:16cv291; *Locklear v. Bristol-Myers Squibb Company et al.*, 3:16cv341; and *Lyons v. Bristol-Myers Squibb Company et al.*, 3:16cv414.

[16] *See* Stipulated Order Establishing Case Management Schedule, Mar. 23, 2017, ECF No. 273.  By this time, the *Johnson* case had been dismissed, leaving five cases in the First Trial Pool.

[17] After *Eckert*, *Perez*, and *Locklear* were also dismissed, *Lilly v. Bristol-Myers Squibb*, 3:17cv186 was added to the First Trial Pool.  Case Management Order No. 6 at 2-3, June 6, 2017, ECF No. 383.

[18] Order at 2, Mar. 13, 2018, ECF No. 786.

[19] Orders Setting Trial and Pretrial Schedules, Mar. 13, 2018, ECF Nos. 788-90.

[20] Order, Apr. 28, 2018, ECF No. 876.

On August 10, 2018, the Court randomly selected forty cases for case-specific discovery ("Second Discovery Pool") and permitted each side to strike five cases from the pool.[21]  For the remaining thirty cases, the Court ordered Plaintiffs to provide a completed Plaintiff Fact Sheet; medical, financial, and/or gambling records authorizations; and copies of relevant medical, financial, and/or gambling records within two months.[22]  After the strike process and review of potential *Lexecon*[23] issues, the Second Discovery Pool was reduced to twenty seven cases.[24] In September, the Court determined that six of the Second Discovery Pool cases would be randomly selected as trial picks and would proceed on a separate "Fast-Track" for discovery and trial ("Fast Track Cases").[25]  Tight discovery deadlines were established for the Fast Track Cases,[26] and trials were scheduled to be held in the summer of 2019.[27]  Ultimately, none of the Second Discovery Pool cases or Fast Track Cases proceeded to trial due to announcement of a global resolution in February 2019.

---

[21] Order Establishing Second Group of Potential Discovery & Trial Pool Cases at 1-3, Aug. 10, 2018, ECF No. 953.
[22] *Id.* at 3.
[23] *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).
[24] Order, Sept. 5, 2018, ECF No. 987.
[25] Case Management Order No. 15 at 2, Sept. 14, 2018, ECF No. 993 ("CMO 15").
[26] Order at 2, Dec. 4, 2018, ECF No. 1073.
[27] Case Management Order No. 18 at 1, Jan. 29, 2019, ECF No. 1111 ("CMO 18"). CMO 18 also set discovery deadlines for the Second Discovery Pool cases.

### C. Settlement

Early in the litigation, upon the recommendation of the Joint Settlement Committee, the Court appointed Cathy Yanni as Settlement Master.[28]  Settlement discussions initially proceeded slowly in light of the outstanding general causation issue.  Despite the obstacle of uncertainty regarding general causation, the Parties held several settlement conferences with Settlement Master Yanni, meeting almost monthly from June through October 2017.[29]  After settlement of the three First Trial Pool cases in April of 2018, on May 2, 2018, the Court entered Global Settlement Order No. 1 to facilitate the exchange of information between the Parties in order to aid settlement discussions toward a global resolution.[30]

After several months of negotiations and in-depth case review, the Parties reached agreement and on February 15, 2019, announced that they had entered into a Confidential Master Settlement Agreement intended to resolve Abilify compulsivity claims pending in state and federal courts throughout the United States.[31]  Since announcement of the settlement, the Parties have worked diligently

---

[28] Order, Feb. 28, 2017, ECF No. 214.

[29] Case Management Order No. 7, June 30, 2017, ECF No. 411; Order, Oct. 25, 2017, ECF No. 585.

[30] Global Settlement Order No. 1, May 2, 2018, ECF No. 881.

[31] Joint Notice of Proposed Settlement Program, Feb. 15, 2019, ECF No. 1125; *See also* Order Regarding Settlement Agreement and Deadlines at 1, Feb. 25, 2019, ECF No. 1135.

to ensure the success of the settlement.  As noted in the Court's Order describing the settlement, a 90% acceptance rate was required for the settlement to be effective.[32] Defendants have certified compliance with that requirement.

### D. Capital Contributions and Litigation Expenses

Pursuant to CBO 1, the Plaintiffs' Executive Committee had the authority to make assessments to "effectively prosecute the interests of the litigation."[33]  Over the course of the litigation, Plaintiffs' Leadership contributed a total of $3,610,000.00 across five assessments to the Litigation Fund, which was managed by the Special Master and CPA.  The Litigation Fund was used to pay shared costs such as a document production and review platform, court reporting services, translation services, as well as general expert fees, Special Master fees, Settlement Master fees, and fees for the Court-appointed CPA.  Requests for payment from the Litigation Fund were reviewed by the Special Master, CPA, and PFFC, and payments were made only after all of their approvals.  As of November 30, 2019, $3,587,249.36 has been paid from the Litigation Fund, essentially exhausting the Fund.

---

[32] Order Establishing the MDL 2734 Qualified Settlement Fund and Appointing Claims Administrators at 2, Feb. 21, 2019, ECF No. 1131.
[33] CBO 1 at 2.

### E. Attorney Hours Submissions

CBO 1 required all Plaintiffs' counsel seeking to recover common benefit fees and/or expenses to "keep a daily contemporaneous record of their time and expenses, noting with specificity the amount of time and particular activity along with confirmation that authority was obtained to have undertaken that common benefit effort."[34]  Time and expense records were required to be submitted into the Time Locker and Expense Locker systems every two months.[35]  The Special Master, CPA, and PFFC developed time and expense entry guidelines consistent with the requirements specified in the Court's Order and monitored the submission of firms' time and expense records.

Eighteen firms (thirteen with Leadership appointments and five without such appointments) submitted Applications totaling approximately 70,400 hours for common benefit consideration.[36]  Of those hours, approximately 25,925 (37%) were designated as hours related to document review.

_____

[34] _Id._ at 3.
[35] _See id._ at 3-4.
[36] An additional four firms put approximately 75 hours of time into TimeLocker during the litigation but did not submit applications for common benefit awards and so are excluded from this report.

12

### III.    Legal Standard for Common Benefit Awards

The common benefit doctrine permits "the creation of a common fund in order to pay reasonable attorneys' fees for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries."[37]  The common benefit doctrine has its roots in the court's equitable powers, *quantum meruit*, and inherent authority to manage complex litigation.[38]  The primary goal in determining a fee award in common fund cases is to determine an amount that is reasonable under the circumstances.[39]

---

[37] *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 769 (E.D. La. 2011) (citing *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring)). *See also* Manual for Complex Litigation (Fourth) § 14.11 (2004); *In re Home Depot Inc.*, 931 F.3d 1065, 1079 (11th Cir. 2019) ("A common-fund case is when 'a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'" (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980))).

[38] *See In re Vioxx*, 802 F. Supp. 2d at 770 ("[T]he Fifth Circuit has long recognized that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and to compensate them for their work." (citing *In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977))); Manual for Complex Litigation (Fourth) § 14.121 (2004) ("The common-fund exception to the American Rule is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and unjust enrichment."). *See also Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991); *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 921 (N.D. Ohio 2003).

[39] *See Camden I*, 946 F.2d at 774-75.  *See also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* 2008 WL 682174, at *5 (D. Minn. Mar. 7, 2008) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)); *In re Sulzer*, 268 F. Supp. 2d at 922-23 ("The ultimate issue is whether the Court's 'award of attorneys'

In the Eleventh Circuit, *Camden I Condominium Ass'n, Inc. v. Dunkle* stated that the factors enunciated in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974) are appropriate to use when setting, evaluating, and reviewing fee awards in common fund cases.[40] Those factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other reemployment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[41]

While the *Johnson* factors serve as guidance for determining a fee award, the *Camden* court noted that those factors are not exclusive because "any fee must be determined upon the facts of each case,"[42] and "[i]n most instances, there will also

---

fees in common fund cases [is] reasonable under the circumstances.'" (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779 (6th Cir. 1996))).

[40] *See Camden I*, 946 F.2d at 775 ("We agree with the Tenth Circuit that the *Johnson* factors continue to be appropriately used in evaluating, setting, and reviewing percentage fee awards in common fund cases."). *See also*, *In re Home Depot*, 931 F.3d at 1090 (citing *Camden I*, 946 F.2d at 775).

[41] *Id.* at 772, n.3 (quoting *Johnson v. Georgia Highway*, 488 F.2d at 717-19).

[42] *Id.* at 774.

be additional factors unique to a particular case which will be relevant to the district court's consideration."[43]

## IV.    Special Master's Approach, Review Process, and Review Criteria

Common Benefit Order No. 6 sets forth the process by which law firms could apply for common benefit expense reimbursements and fee awards.[44]  To summarize, each law firm was required to submit a completed Common Benefit Application to me by July 22, 2019.  That Application was to consist of the following:  1) the firm's self-audit of its time and expenses, 2) a Narrative setting forth the firm's qualitative contribution to the litigation, along with biographies of all lawyers who submitted hours, and 3) an Affidavit of a senior partner attesting to the truth and accuracy of the Application, including the certification that the hours and expenses were for the common benefit and in compliance with the Court's Common Benefit Orders.[45] Eighteen firms submitted such Applications.[46]  All were reviewed by myself and Mr. Sansom.

---

[43] *Id.* at 775.
[44] *See* CBO 6 at 3-9.
[45] *Id.* at 6-8.
[46] Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO"); Berger Montague; Childers, Schlueter & Smith, LLC ("Childers Schlueter & Smith"); Cory Watson Attorneys ("Cory Watson"); Farr, Farr, Emerich, Hackett, Carr & Holmes, P.A. ("Farr Law Firm"); Frohlich, Gordon & Beason, P.A. ("Frohlich Gordon"); GoldenbergLaw, PLLC ("GoldenbergLaw"); Kirtland & Packard, LLP ("Kirtland & Packard"); Levin Papantonio Thomas Mitchell Rafferty & Proctor, P.A. ("Levin

Additionally, CBO 6 provides that each firm submitting an Application had the right to make an oral presentation, which would be recorded by a court reporter.[47] On September 18, 2019, I emailed the eighteen firms that had submitted Applications asking if they wished to make an oral presentation. Eleven firms requested the opportunity to present.[48] These presentations were held on October 21, 22, 23, and 31 – all telephonically.

In addition, as noted above, Mr. Sansom and I discussed the possibility of an agreed-upon fee allocation with the PFFC, Co-Lead Counsel, and lawyers from many of the law firms that had submitted Applications.

In making my recommendations as to expense and fee awards, I was guided by both the *Johnson* factors described above and the considerations set forth in CBO 6:

1.    The extent to which each firm made a substantial contribution to the outcome of the litigation;
2.    The quality of each firm or attorney's work;

---

Papantonio"); Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"); Meshbesher & Spence Lawyers ("Meshbesher & Spence"); Napoli Shkolnik PLLC ("Napoli Shkolnik"); Pittman, Dutton & Hellums, P.C. ("Pittman Dutton"); Putnick Legal, LLC ("Putnick Legal"); Restaino Law, LLC ("Restaino"); Robins Kaplan LLP ("Robins Kaplan"); Zimmerman Reed LLP ("Zimmerman Reed"); Zonies Law, LLC ("Zonies Law").

[47] CBO 6 at 4.

[48] AWKO; Cory Watson; Farr Law Firm; GoldenbergLaw; Kirtland & Packard; Levin Papantonio; Lieff Cabraser; Meshbesher & Spence; Napoli Shkolnik; Putnick Legal; Robins Kaplan.

3.      The consistency, quantum, duration, and intensity of each firm or attorney's commitment to the litigation;

4.      The level of experience, reputation, and status of each attorney and firm, including partner participation by each firm;

5.      Common benefit work performed in non-MDL jurisdictions to the extent it contributed to the outcome of the litigation and benefitted the MDL;

6.      Membership and leadership positions within the MDL;

7.      Whether counsel made significant contributions to the funding of the litigation and creation of the Common Benefit Fund;

8.      Commitment to and efforts toward overall resolution of the litigation;

9.      Whether Plaintiffs' Counsel propose an agreement regarding the allocation common benefit fees and expenses; and

10.    Any other relevant factors as guided by governing fee jurisprudence.[49]

As the Order notes, my review was to be a qualitative analysis, not one driven solely by numbers of hours worked or by financial contributions.[50] I therefore applied the information that I received from the Applications, oral presentations, and other consultations to the *Johnson* factors and to the considerations set forth in CBO 6 as I formulated my recommendations.

In making my proposal for a percentage allocation of fees, I considered (in no particular order):

1.      Which attorneys made significant, substantive contributions at key points in the litigation – *e.g.*, the Daubert hearing, readying the First Trial Pool cases for trial, settlement negotiations;

2.      Which attorneys were recognized by their peers for taking on organizational or leadership roles in developing the facts, scientific or legal issues;

---

[49] CBO 6 at 8-9.

[50] *See id.* at 8.

3.    Whether the firm was involved in targeted (versus non-targeted) document review;

4.    Who consistently appeared in Court, taking an active role in arguing and negotiating key issues;

5.    Whether the firm stayed involved throughout the litigation and committed resources to it;

6.    Whether the firm took on tasks that might otherwise require retention and payment of costly outside vendors or consultants;

7.    Whether the firm complied with the Court's Common Benefit Orders;

8.    Who took key depositions or argued key motions;

9.    The level of experience of the attorneys at the firm performing work, including whether firm attorneys or contract attorneys were used;

10.   The number of hours submitted by each firm and what percentage of the hours submitted were for document review;

11.   The fact that this tort presented novel and difficult legal and scientific questions;

12.   The fact that many of the lawyers involved in this matter were experienced mass tort lawyers who took on this work with no certainty of recovery; and

13.   The fact that this litigation proceeded on an aggressive schedule, requiring a significant amount of work in a relatively short period of time, including concurrent general and case-specific discovery and work up.

The fact that my proposal regarding allocation of fees had the support of the affected firms strongly influenced my recommendation. CBO 6 specifically recognizes that an agreement such as this can be considered.[51] The agreement of those closest to the day-to-day work-up of this litigation is powerful evidence that the percentage

---

[51] *See id.* at 9.

allocations I proposed reasonably and fairly compensate the lawyers for the amount and type of work they did.[52]

## V.    Recommendations

On April 11, 2018, the Court entered Common Benefit Fund Order No. 5, which established a holdback assessment of 9% on any Settlement[53] of a case that is pending in the MDL or other cases or claims represented by counsel who have signed the Participation Agreement.[54]  That 9% holdback assessment is to be used to establish a common benefit fund for the compensation of attorneys who performed common benefit work.[55]

---

[52] While the final allocation decision of a fee award lies with the Court, courts have indicated that deference to an agreed-upon allocation is permissible considering the attorneys who performed the work are in a unique position to evaluate each other's contribution to the litigation.  *See, e.g. In re Ampicillin Antitrust Litig.*, 81 F.R.D. 395, 400 (D.D.C. 1978) ("[I]t is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility, and risk."); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp.3d 985, 1006 (N.D. Ohio 2016) (noting "[c]ourts routinely permit counsel to divide common benefit fees among themselves."); Manual for Complex Litigation, 4th, §22.927 ("*Absent agreement among the attorneys*, the court will have to allocate fees among the attorneys…. (emphasis added)); Fed. R. Civ. P. 23(h) 2003 comment ("Courts have also given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion.").

[53] As defined in Common Benefit Fund Order No. 5 at 6, Apr. 11, 2018, ECF No. 848 at 6 ("CBO 5").

[54] *See* CBO 5 at 2-3.

[55] *See id.* at 6, 9-10.

Additionally, the Settlement Agreement specified that part of the settlement funds should be deposited into the Common Benefit Fund.[56]  Those additional funds were designated to be used for, *inter alia*, settlement administration, attorneys' fees and expenses, and common benefit payments.  After payment of the Claims Administrators (BrownGreer PLC; Gentle, Turner, Sexton & Harbison, LLC; and Archer Systems, LLC) for their work administering the settlement and other expenses, the remainder can be used toward an award of common benefit attorneys' fees and expenses.  In consultation with the CPA, I estimate that between the 9% MDL assessment on settled claims and these additional funds, there will be approximately $18,942,070.77 available for a common benefit award (for return of capital, reimbursement of expenses, and fee awards).  Given the quality and quantity of work performed by Plaintiffs' counsel to achieve a successful result in this litigation, as described in greater detail below, I believe this amount is reasonable and recommend that the Court order that this entire amount be used for repayment of capital contributions, reimbursement of common benefit expenses, and awards of common benefit fees.[57]

---

[56] *See* Order Establishing the MDL 2734 Qualified Settlement Fund and Appointing Claims Administrators, at 2-3, Feb. 21, 2019, ECF No. 1131.

[57] The 11th Circuit does not require that a lodestar cross-check be done in determining common benefit fee awards.  *See In re Home Depot*, 931 F.3d at 1091 n.25 (noting that while courts often use a cross-check, "[w]e do not mean to suggest that a cross-check is required.  A lodestar cross-check is a time-consuming exercise.").  *See, e.g.*,

## A. Recommendation Regarding Capital Contribution

I recommend that capital contributions should be fully reimbursed before any other payments are made, as these enabled the litigation to be funded and aggressively pursued.[58]  Over the course of the litigation, Plaintiffs' Leadership contributed a total of $3,610,000.00 to fund the litigation.  Therefore, I recommend reimbursement of each firm's capital contribution in the amounts set forth as follows:

| Firm | Total Capital |
|------|---------------|
| Robins Kaplan | $500,000.00 |
| Cory Watson | $500,000.00 |
| AWKO | $280,000.00 |
| Lieff Cabraser | $280,000.00 |
| Kirtland & Packard | $280,000.00 |
| Napoli Shkolnik | $280,000.00 |
| Zimmerman Reed | $280,000.00 |

_Thorpe v. Walter Investment Mgmt. Corp._, 2016 WL 10518902, at *11 (S.D. Fl. October 17, 2016) (noting that a lodestar cross-check is not required in the Eleventh Circuit); _Waters v. Intern. Precious Metals Corp._, 190 F.3d 1291, 1298 (11th Cir. 1999) ("[W]hile we have decided in this circuit that a lodestar calculation is not proper in common fund cases, we _may_ refer to that figure for comparison." (emphasis added)); _In re Checking Account Overdraft Litig._, 830 F. Supp. 2d 1330, 1362 (S.D. Fl. 2011) (rejecting objectors' request for the court to scrutinize "voluminous time and task records" in evaluating the fee in a common fund case and noting "[t]he lodestar approach should not be imposed through the back door via a 'cross-check'"); _Wilson v. Everbank_, 2016 WL 457011, at *19 (S.D. Fl. Feb. 3, 2016) ("'Under _Camden I_, courts in this Circuit regularly award fees based on a percentage of the recovery without discussing lodestar at all.'" (quoting _Checking Overdraft_, 830 F. Supp. 2d at 1363)).

[58] It is important to note that approximately 60% of these contributions were made prior to the Court's January 22, 2018 order regarding general causation, at which time there was clearly some risk that there would be no recovery.

| Firm | Total Capital |
|------|---------------|
| Levin Papantonio | $280,000.00 |
| GoldenbergLaw | $220,000.00 |
| Farr Law Firm | $220,000.00 |
| Pittman Dutton | $220,000.00 |
| Childers Schlueter & Smith | $220,000.00 |
| Berger Montague | $50,000.00 |
| **Total** | **$3,610,000.00** |

## B. Recommendation Regarding Expenses

In considering expenses, I was cognizant of the fact that there is a relatively limited amount of money to be divided among the common benefit attorneys in this litigation. Due to the limited funds, it would not be cost effective for Mr. Sansom and me to do an item by item review of all submitted expenses. Our preliminary review of these expenses eliminated duplicate entries and expenses that had previously been paid as shared costs and confirmed that the expenses were all incurred in connection with work on the Abilify litigation. After that review, the total amount of expenses remaining was $1,539,845.35. I recommend reimbursement of firms' expenses as follows:

| Firm | Total Expenses |
|------|----------------|
| Robins Kaplan | $599,306.06 |
| AWKO | $294,015.76 |
| Cory Watson | $202,751.80 |
| Lieff Cabraser | $145,503.04 |
| Levin Papantonio | $91,379.38 |
| Kirtland & Packard | $73,853.19 |
| GoldenbergLaw | $41,877.75 |

| Firm | Total Expenses |
|------|----------------|
| Meshbesher Spence | $25,350.72 |
| Farr Law Firm | $24,481.33 |
| Napoli Shkolnik | $22,571.40 |
| Zimmerman Reed | $15,377.65 |
| Pittman Dutton | $3,377.27 |
| **Total** | **$1,539,845.35** |

## C. Recommendation Regarding Fees

Eighteen law firms applied for a common benefit fee award. Each submitted the Application as described in CBO 6, and eleven of them made oral presentations to Mr. Sansom and me in late October. On November 5, 2019, I circulated by email to these eighteen law firms a proposed percentage allocation of common benefit fees and asked that they inform me by the end of the day on November 7, 2019 if they objected to this proposal. I informed them in the original November 5 email that if they did not communicate an objection to me, I would assume that they had none. I reiterated this assumption in another email to those who had not responded as of November 7, 2019. I received no objections, and sixteen firms contacted me indicating either support for or lack of opposition to the proposed percentage allocation; two firms did not respond, and thus, as indicated in my emails, I assume they have no objection. Accordingly, I view the percentage allocations below as agreed-upon by the affected law firms.

| Firm | Percentage Fee Award |
|------|:---:|
| Robins Kaplan | 19.25% |
| Cory Watson | 19.25% |
| AWKO | 19.25% |
| Lieff Cabraser | 7.00% |
| Kirtland & Packard | 6.00% |
| GoldenbergLaw | 6.00% |
| Napoli Shkolnik | 4.75% |
| Farr Law Firm | 4.75% |
| Zimmerman Reed | 3.00% |
| Levin Papantonio | 3.00% |
| Pittman Dutton | 3.00% |
| Putnick Legal | 2.00% |
| Berger Montague | 0.50% |
| Meshbesher & Spence | 0.50% |
| Childers Schlueter & Smith | 0.11% |
| Zonies Law | 0.01% |
| Frohlich Gordon | 0.01% |
| Restaino | 0.01% |

The fact that those who were closest to the day-to-day work of the Abilify litigation agree to this allocation is strong evidence that it reflects a reasonable allocation of common benefit fees.[59]  These lawyers spent approximately three years together working cooperatively to litigate vigorously and to reach a satisfactory resolution of a challenging case.  As such, they have valuable insight into what each firm's contribution was to the result achieved in this MDL.  As I acknowledged in my email circulating the proposed allocation, "virtually every firm on the list will have reasons why it believes the amount allocated to it is too low."  No one, however,

---

[59] *See supra* note 52.

objected on this basis, which confirms my belief that these are fair and reasonable allocations.

I am informed by the CPA that, after reimbursing the $3,610,000.00 for return of capital contributions and $1,539,845.35 for expenses, approximately $13,792,225.42 will remain in the Common Benefit Fund. After consultation with the CPA, I recommend that $131,475.42 of that amount be held in reserve to pay any additional bills that are received, and thus $13,660,750.00 be distributed using the above percentages. If the Court were to accept this recommendation, the amount to be paid to each firm for common benefit fees would be as follows:

| Firm | Percentage Award | Fee Award |
|---|---|---|
| Robins Kaplan | 19.25% | $2,629,694.38 |
| Cory Watson | 19.25% | $2,629,694.38 |
| AWKO | 19.25% | $2,629,694.38 |
| Lieff Cabraser | 7.00% | $956,252.50 |
| Kirtland & Packard | 6.00% | $819,645.00 |
| Goldenberg | 6.00% | $819,645.00 |
| Napoli Shkolnik | 4.75% | $648,885.63 |
| Farr Law Firm | 4.75% | $648,885.63 |
| Zimmerman Reed | 3.00% | $409,822.50 |
| Levin Papantonio | 3.00% | $409,822.50 |
| Pittman Dutton | 3.00% | $409,822.50 |
| Putnick Legal | 2.00% | $273,215.00 |
| Berger Montague | 0.50% | $68,303.75 |
| Meshbesher Spence | 0.50% | $68,303.75 |
| Childers Schlueter & Smith | 0.11% | $15,026.83 |
| Zonies Law | 0.01% | $1,366.08 |
| Frohlich Gordon | 0.01% | $1,366.08 |
| Restaino | 0.01% | $1,366.08 |
| **Total** | **98.39%** | **$13,440,811.93** |

The agreed-upon distribution that I circulated to the firms allocates only 98.39% of the funds available for fees, providing for a 1.61% remainder to account for any future administration expenses. Thus, the total amount retained in the Common Benefit Fund for currently pending and potential additional expenses would be approximately $350,000.00 ($131,475.42 holdback plus $219,938.08 remainder). To the extent that amount is not spent on bills and/or administration by the end of March 2020, I will submit to the Court a Report & Recommendation recommending its apportionment among those firms who submitted Common Benefit Applications.

The materials submitted in the Applications and the information I received in the oral presentations guided me in formulating this proposal. Described below are brief summaries of my considerations in assigning a percentage allocation to each firm.

## 1. **Robins Kaplan, Cory Watson, AWKO (19.25% each)**

I recommend awarding 57.75% of the money available for common benefit fees to these three firms (19.25% to each). By all accounts, the Plaintiffs' lawyers participating in this litigation viewed these three firms as the leaders and those who were most responsible for achieving the successful result. There were somewhat differing views about which of the three made greater or lesser contributions than the other two, but no one disputed that these three firms together should receive the

highest awards. My assessment is that each firm played a somewhat different role, but that it is not appropriate to distinguish among them for purposes of a fee award.

Robins Kaplan had the highest number of hours and expenses invested in the litigation, and it, along with Cory Watson, made the largest capital contribution ($500,000.00). Gary Wilson was Co-Lead Counsel and played an important role in all aspects of the litigation, including getting the litigation started by bringing cases in multiple venues before bringing this matter to the JPML. Additionally, others from the firm were repeatedly cited as playing significant roles in two of the most important aspects of the litigation: trial-pool work-up and the *Daubert* hearing. In particular, Tara Sutton, Julie Reynolds, and Munir Meghjee were often cited as making important contributions to the litigation. Tara Sutton in particular was credited for her substantial role in the *Daubert* hearing. Ms. Sutton presented opening and closing arguments at the *Daubert* hearing, and she presented testimony from Drs. Glenmullen and Hollander. In addition, Mr. Wilson presented testimony from Dr. Bechara, and Mr. Meghjee cross-examined Defense expert Dr. Winstanley. The firm completely worked up the *Lyons* trial pool case for trial, and it assisted in the work-up of the other trial and discovery pool cases, including by providing sample templates of key documents and witness outlines to firms with trial and discovery pool cases.

Cory Watson also made the highest capital contribution ($500,000.00) and had significant hours and expenses. Kristian Rasmussen served as Co-Lead Counsel; he routinely participated in court appearances, was involved in working up the trial and discovery pool cases and provided lawyer and paralegal support to others on the team at the *Daubert* hearing and other key litigation events. Stephen Hunt, Jr. from Cory Watson was also credited by others as playing an active role in the litigation. Ernest Cory is credited, along with Bryan Aylstock, for bringing about the settlement. Cory Watson was actively involved in preparing for trial in the *Viechec* case and worked up additional cases in both groups of Plaintiffs selected as potential trial pool cases. Messrs. Rasmussen and Hunt were also involved in the taking of Defendants' corporate witness depositions.

AWKO by all accounts played a key leadership role in the litigation. Bryan Aylstock's official position was Liaison Counsel (and PFFC member), but the universal view of his colleagues is that he played a much more significant role in bringing about the successful resolution of this litigation than the Liaison Counsel title might suggest. He appeared and took a lead role at court conferences, flew to Japan on short notice to take key depositions, cross-examined a key defense expert at the *Daubert* hearing (Dr. Potenza), and ultimately took the lead in settlement negotiations. Other lawyers from his firm, including Daniel Thornburgh and Stephen Echsner, were actively involved in the work up of experts, discovery issues,

and preparation of the *Lilly* trial pool case for trial.  Also, as a Pensacola-based firm, AWKO was responsible for logistics of team meetings and preparations for court appearances.

It is reasonable to conclude that without the active involvement of these three firms, the successful resolution of this litigation would not have been achieved in early 2019.[60]

### 2. Lieff Cabraser (7%)

Lieff Cabraser had the third highest number of hours, although approximately half were spent in document review which, while necessary, is not valued on par with such activities as court appearances, arguing motions, depositions, and case work-up.  The most significant contribution from Lieff Cabraser was the work of Lexi Hazam (a member of the PEC and the Science and Expert Sub-committee) in expert development and the *Daubert* hearing process.  Ms. Hazam, along with her colleague Kelly McNabb, was involved with finding and working up key experts and preparing and presenting them at the *Daubert* hearing, as well as cross-examining a key defense expert, Dr. Weed.  Ms. McNabb also played a significant

---

[60] As all mass tort lawyers know, reaching agreement on a settlement is just the beginning.  There is significant work in the months and years that follow to achieve a successful implementation of that settlement.  Robins Kaplan, Cory Watson, and AWKO have been actively involved throughout 2019 in working to bring the settlement to completion.  Additionally, in the last year, there has been significant work on Common Benefit Fund matters in which Mr. Hellums of Pittman Dutton has been actively involved.

role in third party discovery. I recommend that Lieff Cabraser be awarded 7% of the money available for common benefit fee awards in recognition of the importance of their work to the result achieved.

### 3. **Kirtland & Packard and GoldenbergLaw (6% each)**

These two firms were recognized by their peers for consistently being important players in the critical work-up of the Plaintiffs' case through their involvement in discovery issues, motions practice, and case management. Both Behram Parekh of Kirtland & Packard and Marlene Goldenberg of GoldenbergLaw were described as having been active throughout the litigation and as reliable, capable team players.

Kirtland & Packard billed over 3,000 hours, most of which was Mr. Parekh's work. He was the point person for working with the ESI vendor, negotiating the ESI protocol, and all aspects of document discovery, including negotiating with Defendants on all aspects of document production and arguing discovery issues before Judge Rodgers and Magistrate Judge Jones. Mr. Parekh's knowledge of ESI and work with the document platform vendor Catalyst obviated the need to hire a separate vendor or consultant for those issues. He supervised targeted document review that identified documents for use in depositions and preparation of experts and was heavily involved in preparations for, and taking, corporate witness depositions.

The time billed by GoldenbergLaw (approximately 1,500 hours) was almost exclusively Marlene Goldenberg's work.  Ms. Goldenberg worked closely with Mr. Parekh on discovery issues, including on supervision of and providing feedback to document reviewers.  She also played a significant role in case management – organizing the teams taking and preparing for depositions, scheduling and running calls for document reviewers, and coordinating the process for identifying deposition designations for trial.  Additionally, she took depositions of company witnesses and negotiated with Defendants on discovery issues.

In recognition of their contributions to the result achieved, I recommend that each of these two firms be awarded 6% of the common benefit fee.

### 4.  **Napoli Shkolnik and Farr Law Firm (4.75% each)**

These firms were acknowledged by their peers as playing helpful, targeted roles in pursuing the Abilify litigation.

Napoli Shkolnik's work fell into two general categories: document review and work on scientific and expert issues.  58% of their time was spent on document review, targeted and non-targeted.  As a part of the Science and Expert Sub-Committee, Ms. Liakos was significantly involved in expert development (particularly with regard to Dr. Glenmullen) and *Daubert* briefing; she also took some significant company depositions.

George Williamson was the primary attorney at the Farr Law Firm working on the Abilify litigation. Mr. Williamson's contribution was primarily in the discovery phase of the litigation; he took depositions and assisted in the preparation for depositions, including by doing and supervising targeted document review. Additionally, he was involved in developing requests for production to the Defendants and ESI search terms.

In recognition of their contributions to the result achieved, I recommend that each of these two firms be awarded 4.75% of the common benefit fee.

### 5. <u>Pittman Dutton, Zimmerman Reed, Levin Papantonio, (3% each) and Putnick Legal (2%)</u>

These four law firms had relatively small, but valuable roles in moving the litigation forward.

Chris Hellums of Pittman Dutton was an active member of the PFFC. He was deeply involved in the work of reviewing and evaluating submissions of shared costs, formulating methodology for capital contribution assessments, and undertaking budget projections. His work was extremely valuable to both Mr. Sansom and me, including his willingness to follow up with other Plaintiffs' lawyers on various issues that arose. Additionally, Pittman Dutton performed about 900 hours of document review.

Zimmerman Reed's substantive work primarily focused on discovery issues, including motions to compel production of medical records and other key documents, privilege issues involving Defendants' document production, preparation for company witness depositions, and third-party discovery. J. Gordon Rudd, Jr. and James Watts were the attorneys at Zimmerman Reed who did this work. Additionally, the firm did a significant amount of document review work (68% of the firm's total hours), some of which was performed by contract attorneys.

The vast majority (84%) of Levin Papantonio's hours were spent on document review, some of which was done by contract attorneys. Additionally, the firm played a supporting role, assisting with the review of draft briefs and assisting with deposition preparation, including taking some depositions.

Marybeth Putnick of Putnick Law, who did not have a Leadership appointment, was asked by AWKO to assist with scientific issues in the litigation, as she had an advanced degree (Ph.D.) in psychology. Among other things, Ms. Putnick reviewed scientific literature, assisted in expert preparation, assisted in *Daubert* briefing, assisted in the preparation of cross examination of defense experts, helped develop a model for valuation of gambling losses, and contributed to preparing the *Lilly* trial pool case for trial. She spent a total of approximately 1,600 hours on this work.

In recognition of their contributions to the result achieved, I recommend that Zimmerman Reed, Levin Papantonio, and Pittman Dutton each be awarded 3% of the common benefit fee and that Putnick Legal be awarded 2% of the common benefit fee.

### 6.  <u>Others (0.5%- 0.01% each)</u>

The remaining six firms (Berger Montague, Meshbesher & Spence, Childers Schlueter, Zonies Law, Frohlich Gordon, and Restaino) had relatively small roles in this litigation for which I concluded some minimal financial award would be appropriate.  I recommend that these firms together be awarded a total of 1.14% of the common benefit fee.

## VI.    Conclusion

For all the reasons set forth herein, I recommend that the Court enter an Order that the following should be paid by the CPA from the Common Benefit Fund:

1. $3,610,000.00 to reimburse firms (in the amounts set forth herein) for their capital contributions;

2. $1,539,845.35 to reimburse firms (in the amounts set forth herein) for common benefit expenses; and

3. $13,660,750.00 in fee awards (allocated among the eighteen firms that submitted Applications in the percentages and amounts set forth herein).

Respectfully submitted,

_____
Ellen K. Reisman
REISMAN KARRON GREENE LLP
1700 K Street NW, Suite 200
Washington, D.C. 20006
202-695-7712
Ellen.Reisman@rkgattorneys.com